In re CORPORATE JET
AVIATION, INC., Debtor.

CORPORATE JET AVIATION,
INC., Plaintiff,

v.

Charles D. VANTRESS, Defendant.

Bankruptcy No. 81–05249A.
Adv. No. 82–0651A.

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

Jan. 23, 1986.

See also 45 B.R. 629.

James J. Brissette, Howard & White, and J. Michael Lamberth, Palmer, Lamberth, Bonapfel & Cifelli, Atlanta, Ga., for plaintiff/debtor.

David G. Russell, Kutak Rock & Campbell, Atlanta, Ga., for defendant.

## ORDER

W. HOMER DRAKE, Bankruptcy Judge.

The plaintiff/debtor in possession, Corporate Jet Aviation, Inc. ("CJA"), commenced this adversary proceeding against the defendant, Charles D. Vantress ("Vantress"), by filing a complaint to recover $450,000.00 paid to Vantress by CJA in redemption of 350 shares of CJA common stock. One of the five counts in CJA's complaint alleges that the redemption should be set aside as a fraudulent transfer under 11 U.S.C. § 548(a)(2). In hearings held on December 18 and 19, 1985, the Court heard evidence on the issue of whether CJA received "reasonably equivalent value" in the redemption, within the meaning of § 548(a)(2). At these hearings, Vantress moved for involuntary dismissal under Fed.R.Civ.P. 41(b), incorporated by reference in Bankr.R. 7041. The Court, having taken this motion under advisement, now denies it and enters the following Order.

## FINDINGS OF FACT

Prior to April 1, 1981, the President and Chairman of the Board of Directors of CJA, Richard H. Brannan ("Brannan"), owned 62% of CJA's common stock, while Vantress owned the remaining 38%. Vantress' original investment in the stock was $210,000.00. In March of 1981, CJA and Hangar One, Inc. ("Hangar One") discussed the sale of some of CJA's assets including the facility at the Peachtree-DeKalb Airport to Hangar One. This agreement was evidenced by a memorandum of intent dated March 6, 1981. On March 17, 1981, Brannan and Vantress executed a letter agreement to have CJA redeem all of Vantress' stock for $450,000.00. Brannan and Edward E. Carter ("Carter"), CJA's general counsel, had decided that $450,-000.00 was the value of Vantress' stock by calculating what 40% of CJA's value would be after the proposed sale to Hangar One.

The next day, March 18, 1981, the following events occurred: Vantress and Brannan, as shareholders and members of the Board of Directors of CJA, authorized the proposed sale to Hangar One; Vantress resigned from CJA's Board of Directors; CJA agreed to indemnify Vantress for any claims arising from future operations of CJA; and Vantress tendered his shares of stock to CJA in exchange for a check from CJA in the amount of $450,000.00, with the understanding that the check would be held until the sale to Hangar One was completed. In the shareholder authorization, Vantress and Brannan waived their rights to receive the fair value of their stock pursuant to Ga.Code Ann. § 22–1202 [now O.C. G.A. § 14–2–251].

After the execution of a sale agreement on March 23, 1981, the sale of assets to Hangar One took place on March 28, 1981. CJA received from Hangar One a total of $3,519,583.00 consisting of $1,200,000.00 in cash, a note from Hangar One in the amount of $550,000.00, and the assumption by Hangar One of liabilities in the amount of $1,769,583.00. On April 1, 1981, the redemption of Vantress' stock took place. Vantress received another check in the amount of $450,000.00 and authorized Carter to deliver all of Vantress' stock to CJA. Vantress subsequently negotiated the check.

The relationship between the redemption and the sale to Hangar One is not entirely clear. The redemption of Vantress' stock is not explicitly required as a condition to the purchase by Hangar One of CJA's assets in either the March 6 memorandum of intent, the March 23 agreement, or the March 28 closing memorandum. Deposition testimony given by Frank W. Hulse, the President of Hangar One at the time of of the sale, indicates that Hangar One desired that Vantress' stock be redeemed in order to avoid any problems with Vantress as minority shareholder. While the re-

demption does not appear to have been an absolutely necessary pre-condition to Hangar One's purchase, the sequence of events clearly shows that the redemption was effected to facilitate the sale to Hangar One. It follows that if the redemption had not taken place, the sale of assets to Hangar One would have brought a lower price.

The value of the stock redeemed by Vantress is also subject to some dispute. CJA's audited financial statements show that total stockholders' equity on March 31, 1981 was $841,192.00. This figure reflects the sale of assets to Hangar One but not the redemption of Vantress' stock. Since the financial statements prepared in accordance with Generally Accepted Accounting Principles do not purport to reflect the fair market value of assets, this figure is not necessarily determinative of the fair market value of Vantress' stock.

Testimony by M. Ross Lane, an accountant, indicates that prior to the redemption, CJA's liquidity position was comparable to that of similar businesses. A better indication of the value of Vantress' stock is the fact that Brannan estimated its value as $450,000.00. The significance of this estimate is tainted by its possible inclusion of a premium to facilitate the sale to Hangar One. Without addressing the issue of whether CJA was solvent after the redemption, the Court finds that Vantress' stock had a positive value prior to the redemption. The Court suspects however that this value was less than $450,000.00.

## CONCLUSIONS OF LAW

Under 11 U.S.C. § 548(a)(2), CJA may avoid the transfer of the $450,000.00 to Vantress as a fraudulent transfer, if CJA can show that it "received less than a reasonably equivalent value" in the redemption and that the requirements of 11 U.S.C. § 548(a)(2)(B)(i), (ii), or (iii) are met. CJA has the burden of proof under § 548. *See* L. King, 4 *Collier on Bankruptcy* ¶ 548.10, at 548–111 (15th ed. 1985).

In the context of a foreclosure sale of real property, the Fifth Circuit Court of Appeals in *Durrett v. Washington Nation-*

*al Insurance Co.*, 621 F.2d 201, 203 (5th Cir.1980), addressed the issue of what is a "fair equivalent" under the fraudulent conveyance statute in § 67 of the Bankruptcy Act of 1898. The Court chose 70% of the market value of the property as a fair equivalent of the value of the property. *Id.*

A good interpretation of *Durrett* is set forth in *First Federal Savings & Loan Association of Bismarck v. Hulm (In re Hulm)*, 45 B.R. 523, 528 (Bankr.D.N.D. 1984), after the case was remanded by the Eighth Circuit Court of Appeals in *First Federal Savings & Loan Association of Bismarck, Inc. v. Hulm (In re Hulm)*, 738 F.2d 323 (8th Cir.1984). The Eighth Circuit held that price alone was an insufficient basis on which to determine whether reasonably equivalent value had been provided at a foreclosure sale. *Id.* at 327. After an evidentiary hearing, the Bankruptcy Court applied the 70% rule set forth in *Durrett.* The Court stated that *Durrett* was applicable to foreclosure sales, because in the case of most foreclosure sales, the only significant factors are the price paid and the fair market value of the property. 45 B.R. at 528.

The case at bar does not involve a foreclosure sale of real property. Given the differences between the redemption presently under consideration and the foreclosure sale in *Durrett*, and the difficulties in determining the value received by CJA, the Court finds that it would be inappropriate to attempt to apply the 70% rule announced in *Durrett* to the facts of this case. Instead, the Court will address the question of reasonably equivalent value in this case as a factual issue. *See Consove v. Cohen (In re Roco Corp.)*, 701 F.2d 978, 981–982 (1st Cir.1983).

In exchange for the $450,000.00, Vantress asserts that CJA received reasonably equivalent value in the form of Vantress' stock, Vantress' waiver of his right to dissent under Ga.Code Ann. § 22–1202, Vantress' waiver of his contract right to receive $991,888.00 in exchange for his stock under the shareholders' agreement, sav-

ings from not having to authorize additional stock, increased corporate responsiveness, and the facilitation of the sale of CJA's assets to Hangar One.

In most cases, courts have found that stock redemptions fail to supply reasonably equivalent value. *Consove,* 701 F.2d at 982–983; *Louisiana Industrial Coatings, Inc. v. Pertuit (In re Louisiana Industrial Coatings, Inc.* ), 31 B.R. 688, 698 (Bankr. E.D.La.1983); *Flanigan v. DeFeo (In re DeFeo Fruit Co., Inc.* ), 24 B.R. 220, 225 (Bankr.W.D.Mo.1982). In these cases, the Courts found that on the date of the transfer of money from the debtor to the shareholder, the stock to be redeemed had little or no value. *Consove,* 701 F.2d at 983; *Louisiana Industrial,* 31 B.R. at 698; *Flanigan,* 24 B.R. at 225. In *Day v. Central Fidelity Bank, N.A. (In re Appomattox Agri-Service, Inc.* ), 6 B.C.D. 1239 (Bankr.W.D.Va.1980), the Court found that redeemed stock did in fact supply reasonably equivalent value in exchange for money and accordingly held that no fraudulent transfer had occurred. *Id.* at 1241.

The Court in *Consove* expressly declined to find that the inability of treasury stock to provide an economic resource to creditors implies that no stock redemption can supply reasonably equivalent value. *Consove,* 701 F.2d at 982. Instead, the Court narrowed its holding to the following: "The implication of the bankruptcy court's holding is merely that when a corporation with one shareholder redeems all of its outstanding stock, the value of this stock in the hands of the corporation is at best questionable." *Id.* This holding is premised on the Court's presumption that the value of the stock redeemed is its value in the hands of the debtor. *Id.* The Court then held in the alternative, that if the proper measure of the value of the stock is its value in the hands of the shareholder, then the redemption was fraudulent because the stock was worthless. *Id.* at 982–983.

This Court must first examine the *Consove* Court's conclusion that reasonably equivalent value refers to value in the hands of the debtor rather than in the hands of the stockholder. The Eleventh Circuit Court of Appeals in *Jones v. National City Bank of Rome (In re Greenbrook Carpet Co., Inc.* ), 722 F.2d 659, 661 (11th Cir.1984), held that when a bank transferred money to a debtor, knowing that the debtor would immediately invest the funds in "a speculative venture," the transfer still provided reasonably equivalent value to the debtor. The Court stated, that "[t]he issue under section [548] (a)(2) is whether the *bank* received more consideration that it was due." *Id.* (emphasis in original).

This Court does not find that it is necessary to conclude that the First and Eleventh Circuits disagree on this point. The First Circuit in *Consove* narrowed its opinion to hold that the value of redeemed stock is "questionable." *Consove,* 701 F.2d at 982. The Eleventh Circuit's holding in *Greenbrook* concerned the transfer of money, which clearly has the same value in the hands of the debtor and the bank. The *Greenbrook* holding implies that reasonably equivalent value is measured by the value which the debtor receives irrespective of his inability to subsequently realize that value.

CJA argues that the inability of treasury stock to provide a benefit to creditors prevents it from providing a reasonably equivalent value. Section 548, by its terms, does not specify that reasonably equivalent value is limited to value to the creditors of the debtor. Instead, the statute speaks of reasonably equivalent value in terms of value "to the debtor."

While the Court is aware of the policy of administering the estate for the benefit of creditors, the Court does not find that this policy necessitates a finding that the redemption of stock provides no value to the debtor. The value inures to the remaining equity holders by increasing their share of the estate, in the same manner that the payment of a debt increases the remaining creditors' share of the estate. It follows that to the extent that Vantress' stock had value when Vantress was paid, Vantress

transferred value to CJA. As the Court noted in its findings of fact, this value was probably less than $450,000.00. The Court will not address the question of whether this value alone constitutes reasonably equivalent value. Instead, the Court will consider it in conjunction with the other items of value received by CJA as a result of the redemption.

Vantress' waiver of his statutory right under Ga.Code Ann. § 22–1202 to dissent to the sale and receive the fair value of his stock is arguably worth the fair value of the stock. Without speculating on the result of the exercise of Vantress' rights under this statute, the Court will note simply that the waiver of this right facilitated the sale of assets to Hangar One.

Vantress asserts that under the shareholders' agreement, he was entitled to $991,888.00 in exchange for his stock. He argues, therefore, that his waiver and release of this right is worth that amount. Vantress' ability to recover under the shareholders' agreement was dependent upon the financial condition of CJA. O.C. G.A. § 14–2–93(b) precludes any redemption of stock that would render the corporation insolvent. Given CJA's declining financial position, the Court finds it unlikely that this amount would have been recovered pursuant to the shareholders' agreement. To the extent that CJA was solvent when Vantress waived his rights under the shareholder's agreement, these rights apparently had value.

Vantress argues that the redemption of his stock prevented CJA from having to spend money to authorize additional stock. Vantress has not offered evidence of the amount actually saved. While the Court agrees that there may have been some savings, the Court does not find that such savings are significant for the purposes of the issue presently under consideration.

Similarly, the Court has difficulty attaching value to the increased corporate responsiveness allegedly provided by the redemption of Vantress' stock. The Court will consider this benefit only to the extent that it may have facilitated the sale to Hangar One.

As the Court noted in its opinion in this adversary proceeding on January 9, 1985, reasonably equivalent value for the purposes of § 548(a)(2)(A) "need not come from the transferee, but may come from a third party." *Corporate Jet Aviation, Inc. v. Vantress (In re Corporate Jet Aviation, Inc.)*, 45 B.R. 629, 635 (Bankr.N.D.Ga. 1985). The redemption of Vantress' stock was accompanied by the release of his right to dissent to the sale to Hangar One under Ga.Code Ann. § 22–1202 and by the release of his right to recover under the shareholders' agreement. Through these waivers Vantress forfeited his rights to possibly recover from CJA out of the proceeds of the sale to Hangar One. More importantly, the redemption accompanied by these waivers dispelled Hangar One's misgivings about dealing with CJA while minority shareholder interests were outstanding. The Court is unable to determine precisely how much less CJA would have received from Hangar One without the redemption of Vantress' stock. The Court finds only that in light of the deposition testimony given by Frank Hulse, the President of Hangar One at the time of the sale, the redemption of Vantress' stock significantly increased the amount that CJA realized from the sale of assets to Hangar One.

The imprecise nature of the Court's determinations with respect to the value of the redeemed stock, the value of the waivers of Vantress' rights under Ga.Code Ann. § 22–1202 and under the shareholders' agreement, and the increase in the amount received from Hangar One make a strict application of the 70% test delineated in *Durrett* inappropriate. After weighing the relevant facts, the Court finds that Vantress' receipt of $450,000.00 was supported by reasonably equivalent value. This finding precludes any recovery by CJA under the fraudulent transfer allegations contained in Count I of the complaint. It does not address Counts II, III, and IV of the complaint. For that reason, the Court will

hold hearings with respect to these three counts on January 22 and 23, 1986.

IT IS SO ORDERED.