In re BOWERS–SIEMON CHEMICALS
COMPANY, Debtor.

BOWERS–SIEMON CHEMICALS
COMPANY, Plaintiff,

v.

H.L. BLACHFORD, LTD.,
et al., Defendants.

Earl A. BOWERS and Martha
L. Bowers, Plaintiffs,

v.

H.L. BLACHFORD, LTD., Blachford En-
terprises, Inc., Blachford Investments,
Inc., Metcalf Investment Company,
Inc., Walter B. Metcalf III, and Leroy J.
Cook, a/k/a Jack Cook, Cross–Defen-
dants and Third–Party Defendants.

Bankruptcy Nos. 89 B 13574, 89 A 1005.

United States Bankruptcy Court,
N.D. Illinois, E.D.

April 30, 1992.

Max Chill, Steve Radtke, Chill, Chill & Radtke, P.C., Chicago, Ill., for Bowers–Siemon.

Robert Downing, Erica Landsberg, Sidley & Austin, Chicago, Ill., for Earl and Martha Bowers.

## MEMORANDUM OPINION

SUSAN PIERSON SONDERBY, Bankruptcy Judge.

This matter is before the Court on the motion for summary judgment of Bowers–Siemon Chemicals Company, debtor and plaintiff, ("BSCC"), on its claims of fraudulent conveyance under § 548(a)(2)(a)—(B)(ii) of the Bankruptcy Code and under Ill.Rev. Stat. ch. 59, ¶ 4, avoidable preference under § 547 and common law trust fund doctrine, against Earl and Martha Bowers (the

"Bowers"), and the Bowers cross motion for summary judgment or motion to dismiss the common law trust fund claim. Now therefore, for the reasons set forth herein, BSCC's motion for summary judgment on its claims of fraudulent conveyance under § 548(a)(2) and Ill.Rev.Stat. ch. 59, ¶ 4 and under the trust fund doctrine are denied, BSCC's motion for summary judgment on its claims of an avoidable preference under § 547 is granted and the Bowers' cross motion for summary judgment is granted.

## BACKGROUND

BSCC is a Delaware corporation authorized to do business in Illinois. BSCC operates under the assumed name, Metcalf Industries, Inc. ("MII") which it adopted on January 22, 1987. BSCC also operates a separate division under the name Armstrong Sheave and Equipment Division ("Armstrong").

On August 5, 1985, the Bowers sold their shares in BSCC to Metcalf Investment Company, Inc. ("MIC") for $840,454 pursuant to a Stock Purchase Agreement.[1] The 190,641 shares transferred pursuant to the Stock Purchase Agreement constituted 53.58% of the outstanding shares of BSCC. MIC paid $440,454 in cash and executed an installment promissory note for the remaining $400,000 (the "Note").[2] The Note was secured by a pledge of the BSCC stock, pursuant to a Stock Pledge Agreement entered into between MIC, the Bowers, and Union National Bank of Joliet as escrowee. BSCC was not a party to the Stock Purchase Agreement, the Note or the Pledge Agreement.

BSCC and Earl Bower entered into a Consulting Agreement in connection with the Stock Purchase Agreement. Under the Consulting Agreement, Earl Bower agreed

---

1. MIC was incorporated under the laws of the State of Illinois on March 7, 1985. It was incorporated in part for purchasing the BSCC stock. Since its incorporation it has never been involved in manufacturing or selling products or providing services for a fee. At the time of its incorporation, Walter B. Metcalf III ("Metcalf") and L. Jack Cook ("Cook") were the sole shareholders of MIC.

2. To finance the purchase of the stock MIC borrowed $600,000 from BSCC on an unsecured basis and executed a demand note for this amount. BSCC had borrowed the money which it lent to MIC against a line of credit from NBD Business Finance, Inc. ("NBD"). The NBD loan was secured by a first lien on all of BSCC's assets.

to act as consultant from April 16, 1985 to April 15, 1990.[3] Earl Bower also agreed not to compete with BSCC during the term of the agreement and for three years thereafter. In return for his services Earl Bower would be paid $475,000 in ten installments plus benefits including, life and health insurance and auto expenses. The Consulting Agreement was also secured by the Stock Pledge Agreement, but MIC was not a party to the Consulting Agreement.

After the Bowers sold their stock they were not involved in the management or financial operations of BSCC, nor did they have access to financial information on BSCC. Earl Bower did, however, render significant services to BSCC over the next few years.

Following the stock transfer, Cook became the President of BSCC. Cook began expanding BSCC's business and entered into two asset acquisitions shortly after taking control of BSCC. On December 23, 1985, BSCC purchased assets and real estate located in Frankfort, Illinois from Diamond Shamrock Chemicals Corporation for $925,000 plus the value of the inventory. BSCC paid $750,000 in cash and executed a promissory note for the balance. Diamond Shamrock took a mortgage in the real estate as security for the promissory note.

On approximately June 6, 1986, BSCC closed on the purchase of another line of business from Flo–Lube, Inc. The total purchase price for this acquisition was $430,000 plus the value of the inventory and was paid for with $150,000 in cash and a promissory note for the balance. Flo–Lube took a second position security interest in the assets located in Frankfort, Illinois as security for the promissory note. Both of these acquisitions were financed by NBD. BSCC granted NBD a first security interest in all of the assets acquired as security for its loan.

In early to mid–1988, BSCC began experiencing financial difficulties. Due to arrearages to suppliers, some of BSCC's suppliers refused to make shipments unless they were paid. As a result BSCC was having difficulty filling orders.

In September of 1988, BSCC restructured its loan with NBD and executed a Collateral Note for $733,425.56. The Collateral Note was due and payable on October 22, 1988. On October 22, 1988, BSCC was unable to make the payment due on the Collateral Note. Consequently, BSCC and NBD again commenced negotiations to restructure BSCC's debt. After becoming concerned that BSCC would not be able to obtain financing to continue doing business, certain employees of BSCC contacted officers of H.L. Blachford, Ltd., a Canadian corporation, ("Blachford"), to see if they would be interested in acquiring BSCC. Blachford expressed interest in such an acquisition and in February 1989 negotiations began between BSCC and Blachford.

On February 6, 1989, at a meeting in Detroit, Michigan, NBD orally declared a default and made a demand for payment of all amounts BSCC owed NBD. On February 9, 1989, NBD confirmed the declaration of default in a letter to BSCC. NBD agreed to give BSCC until May 6, 1989 to obtain alternative financing. NBD also sent a copy of the February 9, 1989 letter to Earl Bower.

On March 8, 1989, NBD sent another letter to BSCC, setting forth additional defaults and reiterating the extension of time to May 6, 1989. A copy of this letter was also sent to Earl Bower.

During March, the negotiations between Blachford and BSCC continued. On March 22 and 28, 1989, Blachford sent letters to Metcalf, Cook and MIC offering to purchase their stock in BSCC. On March 31, 1989 Blachford sent a letter of intent to purchase the BSCC stock. The letter of intent was executed by Metcalf and Cook.

On March 30, 1989, Blachford incorporated Blachford Enterprises, Inc. ("BEI") under the laws of the State of Michigan. BEI was formed in connection with the proposed acquisition of BSCC.

**3.** The term of the Consulting Agreement was later extended to August 5, 1992. The Note was also extended to August 5, 1992.

On March 31, 1989, BSCC, MIC and BEI entered into a Management Agreement (the "Management Agreement"). The Management Agreement gave BEI joint management control over BSCC's day-to-day operations. The Management Agreement was amended on May 5, 1989 (the "Amended Agreement"). The Amended Agreement granted BEI exclusive access to BSCC's buildings and equipment and required BEI's written consent of all contracts.

Through its involvement in BSCC's management, BEI was able to examine BSCC's books and records and ascertain BSCC's financial condition. During April of 1989, BEI generated lists of BSCC's accounts receivables and a list of BSCC's major supplier-creditors.[4] After BEI reviewed the books and records of BSCC, BEI no longer desired to purchase the stock in BSCC. Instead the parties agreed that the transaction would be changed to a purchase of all of BSCC's assets, except the Armstrong assets.

On April 7, 1989, NBD sent another letter to BSCC indicating that it would no longer extend credit to BSCC due to the existing defaults. Also during April, BEI, Blachford, NBD, MIC and BSCC entered into a Standstill Agreement, under which NBD agreed to allow BEI to operate BSCC and NBD would subordinate its interest in BSCC's inventory, material and new receivables to Blachford. During this time BEI and/or Blachford were advancing funds to BSCC for continued operations. Blachford was also collecting BSCC's accounts receivables and paying the amounts collected to NBD to reduce BSCC's debt.

On April 18, 1989, BSCC received a letter from John D. Born, indicating that participants in the BSCC Employee Stock Option Plan ("ESOP") were prepared to block the proposed sale to Blachford unless their interests were addressed.[5]

On April 21, 1989, the Bowers declared a default under the Pledge Agreement based upon BSCC's defaults in its obligations to NBD, and MIC's and BSCC's failure to pay amounts due the Bowers. In this letter the Bowers also demanded that the escrow agent turn over the BSCC stock which it held in escrow. The escrowee complied with this request and the Bowers received possession of the stock. On May 2, 1989 the Bowers' attorney sent a letter to Blachford's attorneys, informing them that the Bowers would not consent to a sale of BSCC.

In a May 4, 1989 letter, the Bowers claimed the following amounts were due: $300,000.00 plus interest at 10% since August 5, 1988 under the Stock Purchase Agreement/Note; $233,333.32 in consulting fees, medical insurance at $2442.00 per year, life insurance at $4,025.00 per year, accidental death coverage at $550.00 per year, automobile expenses at $460.00 per month, auto insurance at $600.00 per year, unreimbursed expenses of $7805.51, miscellaneous expenses of $1000.00 per year and unreimbursed legal fees incurred in connection with the stock sale of $6293.85, under the Consulting Agreement.[6] The Bowers attorney maintained that the Bowers would not consent to the sale of BSCC's assets unless they were paid.

As a result of the default in the Pledge Agreement MIC could not sell the BSCC stock or vote the stock in favor of an asset sale. BSCC was also unable to obtain alternative financing to pay NBD, the ESOP Defendants or the Bowers.

Negotiations ensued between Robert Downing, attorney for the Bowers and Michael Hansen, attorney for BSCC/MIC. There were also discussions between Han-

---

**4.** The list of supplier-creditors, which was run on the computer on April 8, 1989, indicated that BSCC owed its supplier-creditors $553,963.80. This amount is not completely accurate as Cook testified that some of the liabilities were obligations of Armstrong.

**5.** BSCC had adopted an ESOP on September 22, 1977. Born and several other individuals were participants in the ESOP. These individuals are also defendants in this Adversary proceeding and are collectively known as the "ESOP Defendants".

**6.** The amounts claimed under the Consulting Agreement were based on the obligations being accelerated through the term of the Agreement, which had been extended until August of 1992.

sen and Robert Schwartz, attorney for Blachford. It was Schwartz who initially suggested paying the Bowers $250,000. This offer was rejected by the Bowers. Finally, BSCC agreed to pay the Bowers the full $625,000 which they claimed.

On May 18, 1989, a Settlement Agreement was entered into between the Bowers, BSCC, MIC, Metcalf and Cook. The Settlement Agreement provided that concurrent with the signing of the agreement BSCC would "cause to be paid to the Bowers" $625,000.00. In return the Bowers agreed to return the BSCC stock to MIC and waive any rights under the Stock Purchase Agreement, the Note, the Pledge Agreement and the Consulting Agreement.

By noon of May 18, 1989 the Bowers attorney left the law offices in Joliet, Illinois, where the closing was held, without a check. The Bowers were informed that the money was not yet available, consequently, the Bowers refused to release the stock. A cashiers check for $625,000.00 was later delivered to the Bowers' attorney, by messenger, on May 20 or 22, 1989.[7] The Bowers' attorney gave the messenger the BSCC stock at that time.

The cashiers check was dated May 19, 1989. The money to obtain the cashiers check was drawn from an account in MII's name. Cook had deposited $819,128.63[8] into the account on May 19, 1989. The money which Cook had deposited into the account came from Blachford and was the proceeds from the sale of BSCC's assets. The account had just been opened on May 18, 1989 and was closed approximately two months later.

Also on May 18, 1989, BEI, Blachford, MIC and BSCC executed an Agreement of Sale (the "Agreement"), under which BSCC sold substantially all of its assets to Blachford/BEI.[9] Blachford was given credit for having paid $2,536,180.66 for the assets. Most of this amount was used to pay off BSCC's secured lenders, NBD, Diamond Shamrock and Flo–Lube. None of BSCC's unsecured creditors were paid out of the proceeds of the sale.[10] The Bowers were not present at the closing of the Agreement.

The Bowers were not involved with the negotiations between BSCC, MIC and Blachford. Nor were they informed of the terms or structure of the sale or where the money to pay them was coming from.

After the sale of the assets, BSCC continued to operate the Armstrong division. Although BSCC had sold the Coal City plant to Blachford, Blachford allowed BSCC to operate Armstrong from there. BSCC continued to have cash flow problems, because Blachford had collected its accounts receivable it had no cash with which to operate. The trade creditors continued to withhold shipments while demanding payment. In addition, Blachford had not paid BSCC $200,000 for the inventory.

In June or July 1989, BSCC moved the Armstrong operations to Plainfield Illinois.

On August 16, 1989, BSCC filed its petition under Chapter 11 of the Bankruptcy Code. On October 9, 1990 BSCC moved for authorization to sell the assets of Armstrong for $80,000 plus a 2% commission on gross sales. On October 30, 1990, this Court approved the sale. BSCC filed a Liquidating Plan of Reorganization which was confirmed by this Court on June 18, 1991.

---

7. The parties recollection of the date the cashiers check was delivered differ. Because the transfer occurred during the preference period, whichever date is used, this does not create a genuine issue of material fact.

8. The total amount of cash received from the sale of BSCC's assets was the total amount of funds required .to pay the Bowers and ESOP Defendants.

9. Following the sale BSCC was left with Armstrong equipment worth approximately $20,000, a 1986 Buick valued at approximately $5,000–$6,000 and Canadian equipment valued at approximately $1,200. MIC was left with Omnitech equipment valued at $8,000–$9,000.

10. Using the list of major supplier-creditors generated by Blachford on April 4, 1989, BSCC estimated trade debt at $553,963.84. BSCC also included additional unsecured debt in its bankruptcy schedules of $315,916.48. As noted previously these figures are imprecise because they include some of Armstrong's liabilities.

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 provides that a motion for summary judgment should be granted only if the pleadings, depositions, answers to interrogatories, admissions and affidavits, if any, show that there is no genuine issue of material fact. The moving party bears the burden of showing that there is no issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether the movant has met this burden the evidence is viewed in a light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). On cross motions for summary judgment the court is to rule on each motion individually and both motions should be denied if there is an issue of material fact. *Wausau Insurance Company v. Valspar Corp.*, 594 F.Supp. 269, 270 (N.D.Ill.1984).

In addition Local Rule 12(m) of the General Rules of the United States District Court for the Northern District of Illinois requires the moving party to file a detailed statement of material facts as to which there is no genuine issue. The party opposing the motion is required by Rule 12(n) to file a response to the movant's statement and set forth any facts which require denial of summary judgment. Failure to file a response is deemed an admission of all reasonable facts set forth in the movant's statement.

## DISCUSSION

### 11 U.S.C. § 548(a)(2)

BSCC has moved for summary judgment on its claim that the $625,000 payment to the Bowers was a fraudulent conveyance under § 548(a)(2) of the Bankruptcy Code. Section 548(a)(2) allows the trustee to recover a transfer of an interest in the debtor's property, made within one year of bankruptcy, where the debtor received less than "reasonably equivalent value" *and* the debtor was insolvent or rendered insolvent by the transfer *or* left with "unrea-sonably small capital" following the transfer.

■ At the outset the Bowers dispute whether the transfer to them involved "an interest of the debtor in property." The Bowers contend that the money paid to them was drawn on an account owned by MII, which they claim is a separate legal entity from BSCC. In support of this argument the Bowers cite Cook's testimony that MII was an Illinois corporation. Although Cook was President of BSCC, as a non-lawyer he can not be expected to understand the legal distinction between adopting an assumed name and incorporating as a separate entity. Hansen, the corporate attorney for BSCC, clarified that MII was an assumed name adopted by BSCC in 1987. BSCC confirmed this by attaching a copy of the Application to Adopt An Assumed Name filed by BSCC on January 22, 1987. Based on this evidence this Court concludes that MII was not a separate legal entity, but an assumed name of BSCC. Consequently this Court concludes that the $625,000 payment to the Bowers came from an account belonging to the Debtor.

■ The Bowers argue that even if the account belonged to BSCC, BSCC did not have sufficient control over the money to warrant finding that they money was property of the debtor. Instead they argue, Blachford controlled the application of the money and BSCC was merely a conduit for the transfer. Although the Bowers admit that they do not have personal knowledge of the terms of the agreement between BSCC and Blachford they rely on information adduced through discovery. Specifically the Bowers claim that the Management Agreement and Cook's testimony regarding the same show that Blachford had sole control over BSCC after April 1, 1989 and BSCC could not enter into any agreements without Blachford's approval. Therefore, they conclude it was Blachford who must have approved the Settlement Agreement and payment to the Bowers. The Bowers also assert that Blachford's control over the payment to them is established by provisions in the asset sale agreement requiring BSCC to have control over

a majority of its stock, the fact that the cash paid for the assets was the exact amount necessary to obtain the stock from the Bowers and the ESOP defendants and the fact that Blachford knew the deal couldn't close unless the Bowers were paid.

The Bowers argue that these facts create a material dispute whether the Blachford controlled payment of the money and whether BSCC had an interest in the money. This Court finds that this does not create a genuine issue of material fact but a dispute regarding the legal conclusions which should be drawn from these facts.

The Bowers argument that the money was not property of the BSCC for purposes of § 548 is based on In re Chase & Sanborn Corp., 813 F.2d 1177 (11th Cir.1987), which applied a control test to determine if the debtor had an interest in money transferred through its corporate account. The Bowers characterize Chase & Sanborn as being substantially similar to the present case to warrant a conclusion that BSCC did not have control over the funds. In both cases the accounts were open for relatively short time periods, apparently for conducting the transactions in question. This, however, is the extent of the similarities.

In Chase & Sanborn the account was used to launder money. The money that was put into the account belonged to the debtor's president, the money was then transferred to the president's personal secretary, who immediately paid the money to a third party in partial satisfaction of the president's personal liability. The court applied a "control test" to determine if the money could properly be considered property of the debtor. This test simply required the court to look beyond the particular transfer to the totality of the circumstances to determine if the debtor had control of the funds. As applied to the facts in Chase & Sanborn it was clear that the money belonged to the debtor's president, and that he, not the debtor, controlled the money.[11]

In the present case there is a key fact which clearly distinguishes this case from Chase & Sanborn; the money was paid to BSCC for the sale of its assets. Therefore BSCC clearly had an interest in the money that was placed in the account, whereas in Chase & Sanborn the money that was in the corporate account was the president's personal property and used for his personal purposes. This distinction was also made in In re Suburban Motor Freight, Inc., 124 B.R. 984 (Bkrtcy.S.D.Ohio 1990), where the bankruptcy court determined that the debtor corporation had control over money which was temporarily placed in its checking account.

In Suburban, the stock in the debtor's parent corporation, Suburban Distribution Systems, Inc., ("SDS") was sold for $3 million; $2.1 million in cash and a promissory note for $900,000. Simultaneously, the purchaser of the stock sold part of the debtor's assets, consisting of all of its trucks and trailers for $2.5 million. The bank acting as escrow agent for the closing delivered a check for $2.482 million to SDS, SDS endorsed the check over to Suburban and deposited it into Suburban's regular checking account.[12] Suburban, pursuant to its president's direction, immediately transferred $2.1 million to an escrow account set up for the closing. The shareholders of SDS were then paid from the escrow account. The trustee brought an action to set aside the payment to the shareholders as a fraudulent conveyance.

The shareholders argued that the payment to them was not a transfer of an

---

**11.** An important distinction in Chase & Sanborn was the fact that the money was paid to a noncreditor of the debtor. Where the debtor had no obligation to the transferee, there was no benefit to the debtor in making the transfer and therefore, the court concluded, it was just as likely that the transfer was instigated by the party providing the funds. That is not the case here, there was some benefit to the Debtor. (See discussion, infra, reasonably equivalent value.) In this case the money was paid to the Bowers to obtain the release of BSCC stock so that the asset sale could be consummated. In addition, part of the payment to the Bowers was for BSCC's obligation to the Bowers under the Consulting Agreement.

**12.** Apparently neither SDS nor the purchaser of the stock had a checking account, consequently Suburban's checking account was used for the funds.

interest of the debtor in property. Instead, they claimed, Suburban held the money in trust for their benefit. The court rejected this argument and then applied the "control test" from *Chase & Sanborn.* It concluded that due to the lack of legal restrictions on the use of the funds and commingling money in the account, that the debtor had control, "albeit only for a few fleeting moments" of the money. *Suburban Motor* at 997. The president's direction to transfer the money to the escrow account also solidified the court's conclusion that the debtor was not just a conduit for the money.

In the present case it is unquestionable that the money which was deposited into the account was proceeds from the sale of BSCC's assets. As such BSCC clearly had an interest in the funds. No legal restrictions were placed on BSCC's use of the money, Blachford paid the money to Cook who deposited it into BSCC's account. Cook's actions in writing checks on the account establish sufficient dominion and control over the funds to warrant the conclusion that the money was property of BSCC. In addition none of the BSCC/Blachford transactions documents required the money to be paid to the Bowers. To the contrary, Blachford's attorney testified that the money was BSCC's to do whatever they wanted with it. Based on these facts this Court concludes that the money that was paid to the Bowers was property of the debtor for purposes of § 548(a)(2).[13]

■ BSCC also contends that it did not receive reasonably equivalent value in exchange for the $625,000 payment to the Bowers. BSCC treats the payment in two parts; payment for amounts due under the Note/Stock Purchase Agreement and payment for amounts due under the Consulting Agreement. BSCC argues that it did not receive reasonably equivalent value for

amounts paid to satisfy MIC's obligations under the Note/Stock Purchase Agreement, because it was not liable on the Note and a debtor does not receive reasonably equivalent value for transfers for the benefit of a third party. *In re Burbank Generators, Inc.,* 48 B.R. 204 (Bkrtcy.C.D.Cal. 1985). Regarding the Consulting Agreement, BSCC claims that it did not receive reasonably equivalent value because its obligations under the Consulting Agreement were accelerated and Earl Bowers did not render further consulting services after the payment was made. BSCC also contends that if the settlement with the Bowers is collapsed and viewed as an integral part of the asset sale then the transaction amounted to a stock redemption by BSCC, which is traditionally held to be without any value to the redeeming corporation. *In re Roco Corporation,* 701 F.2d 978 (1st Cir.1983).

■ Initially it should be noted that courts have only found transfers to third parties to be without reasonably equivalent value to the debtor where the transfer is *"solely* for the benefit" of the third party. Where the transfer to the third party results in an indirect benefit, ultimately flowing to the debtor, there is reasonably equivalent value. *Burbank* at 207.

In this case the Bowers claim that the value to BSCC should be measured by the release of the stock which allowed the sale of assets to Blachford to proceed, and not by the underlying components which the payment represented. The Bowers rely on *In re Corporate Jet Aviation, Inc.,* 45 B.R. 629 (Bkrtcy.N.D.Ga.1985), which recognized that a corporation could receive reasonably equivalent value from a stock redemption if the redemption was connected to the sale of the corporation's assets.

In *Corporate Jet* the bankruptcy court denied the debtor's motion for summary judgment based on evidence that the stock redemption was "interconnected" with the

---

13. The Court also rejects the Bowers argument that Blachford controlled the Settlement Agreement and the payment to the Bowers through its powers over BSCC pursuant to the Management Agreement. This Court finds it implausible that by reason of a management agreement, Blachford could stand on both sides of the asset sale

and control both the sale and purchase of the assets. Although the Management Agreement required written consent of all contracts BSCC entered into it is clear that the Settlement Agreement was independent of the day-to-day operations of BSCC and was between Metcalf, Cook, the Bowers and BSCC.

sale of assets. The court acknowledged the general rule that a corporation receives nothing of value when it redeems its stock. However because there was evidence that the minority shareholder would not approve the sale of assets unless his stock was redeemed, the court concluded that there was a question of fact of the value received by the corporation. The court also recognized that in some instances the debtor may not receive a direct benefit, but that the benefit would be received indirectly, through a third party. *Corporate Jet* at 635, 636.

Following a trial on the merits the court denied the debtors claim under § 548(a)(2), finding that the corporation received reasonably equivalent value, albeit indirectly, from the redemption. *In re Corporate Jet Aviation, Inc.*, 57 B.R. 195 (Bkrtcy. N.D.Ga.1986), aff'd 82 B.R. 619 (N.D.Ga. 1987), aff'd without opinion, 838 F.2d 1220 (11th Cir.1988). Although the precise value to the corporation could not be measured, the court found that the release of a statutory right to dissent and waiver of rights to recover under a shareholder agreement, facilitated the sale of assets and allowed the corporation to receive an increased amount from the sale. *Id.*, 57 B.R. at 199.

In this case, BSCC paid $625,000 to obtain a release of its stock following a default in the Pledge Agreement. Unless BSCC can prove that the asset sale could have closed without obtaining a release of the stock from the Bowers, then BSCC received an indirect benefit from the payment. Whether the value of what BSCC received was disproportionately small compared to the $625,000 it paid, is a question of fact which can not be determined from the record currently before this Court. The fact that the stock was returned to MIC and not BSCC does not change this result, the value was not in the stock but in the stock being in the hands of sharehold-

ers who would approve the sale of the assets.[14]

Because this Court has concluded that there is a genuine issue of material fact as to whether BSCC received reasonably equivalent value, summary judgment on BSCC's claim of fraudulent conveyance under § 548(a)(2) must be denied.

### Fraudulent Conveyance—Ill.Rev.Stat. ch. 59, ¶ 4

■ Illinois law on fraudulent conveyance parallels § 548 of the Bankruptcy Code. A transaction may be set aside where there is actual intent to defraud—fraud in fact, or where the transfer is for no or inadequate consideration—fraud in law. *Anderson v. Ferris*, 128 Ill.App.3d 149, 152, 470 N.E.2d 518, 521, 83 Ill.Dec. 392 (1984). With fraud in law cases, intent to defraud is presumed. *Wilkey v. Wax*, 82 Ill.App.2d 67, 69, 225 N.E.2d 813 (1967). BSCC had moved for summary judgment on its claim of fraud in law under Ill.Rev. Stat. ch. 59, ¶ 4.

■ To recover for fraud in law BSCC must prove that there was 1) a voluntary transfer, 2) at the time of the transfer there was existing indebtedness and, 3) after the transfer the debtor failed to retain sufficient property to pay the indebtedness. *Anderson*, 128 Ill.App.3d at 152, 83 Ill.Dec. 392, 470 N.E.2d 518. When this test is established there is a presumption that the conveyance was fraudulent and the burden is on the defendant to prove that adequate consideration was received or that sufficient assets were retained to pay the debts. *Kardynalski v. Fisher*, 135 Ill.App.3d 643, 482 N.E.2d 117, 90 Ill.Dec. 410 (1985).

■ The amount of consideration necessary to support a transfer under Illinois law is less than the consideration required under § 548(a)(2); compare adequate to reasonably equivalent. A transfer is not

---

**14.** BSCC contends that any indirect benefit to it in facilitating the sale of assets is not reasonably equivalent value because the general unsecured creditors received nothing out of the sale proceeds. BSCC cites *In re Independent Clearing House Co.*, 77 B.R. 843 (D.Utah 1987) for its argument that there is no reasonably equivalent value where unsecured creditors do not benefit.

*Independent Clearing* involved a ponzi scheme and the rule cited by BSCC was taken out of context. Furthermore, *Corporate Jet* indicated that reasonably equivalent value should be measured in terms of value to the debtor, and not limited to value to the debtor's creditors. *Corporate Jet*, 57 B.R. at 198.

## 446

subject to avoidance under Illinois law simply because the benefit accrues to a third party. *In re Cash Currency Exchange, Inc.*, 93 B.R. 618, 622 (N.D.Ill.1988). Therefore the transfer of stock to MIC and resulting benefit to BSCC may properly be considered as consideration to support the payment to the Bowers under Illinois law. However, as under the § 548(a)(2) claim, there is a question of fact on the value of the benefit to BSCC in obtaining the release of the stock. Consequently, BSCC's motion for summary judgment on its claim of fraudulent conveyance under Ill.Rev. Stat. ch. 59, ¶ 4 must also be denied.

Avoidable Preference—§ 547

BSCC has also moved for summary judgment on its claim that $281,900.68 paid to the Bowers in satisfaction of its liabilities on the Consulting Agreement, is an avoidable preference under § 547. As in the context of fraudulent conveyances, a threshold requirement to recovery is that the transfer must be a transfer of property of the debtor.

■ The Bowers advance a similar argument in defense to BSCC's preference claim as they did to the fraudulent conveyance claim, that the money was not property of the debtor. The control theory discussed in *Chase & Sanborn* was taken from preference law. It is more commonly known in the preference area as the "earmarking doctrine". Under the earmarking doctrine, property is not considered the debtor's when a new creditor supplies the debtor with funds for the purpose of paying off an existing creditor and the funds are either transferred directly to the existing creditor or transferred to the debtor with the understanding that they will be used to pay the existing creditor. *In re Network 90 Degree, Inc.*, 126 B.R. 990 (N.D.Ill.1991).

In *Network 90* the district court expanded the doctrine to situations where the funds are not provided by a new creditor. In *Network 90* an agreement was entered into between the debtor and one of its suppliers that checks received from customers for sales would be made jointly payable to the debtor and the supplier. The debtor would endorse the checks and then forward them to the supplier. The agreement was later modified and all checks were sent directly to the supplier and the debtor gave the supplier a power of attorney to endorse its name to the checks. Because there was no new creditor providing funds, the debtor argued that the earmarking doctrine was inapplicable. The district court rejected the debtor's position that there must always be a new creditor supplying funds to the debtor, and instead determined that the debtor's control, or lack of control, over the funds that were transferred, was dispositive of whether the earmarking doctrine applied. *Network 90* at 995, 996.

■ Like *Network 90*, this case does not fit the typical situation where the earmarking doctrine is applied; there is not a new creditor supplying funds to pay an existing creditor. Nor is there an express agreement like that in *Network 90* where the debtor's control over money was clearly limited by the requirement that checks be made jointly payable to the creditor. Consequently, if this Court focuses solely on whether BSCC had control over the money, as suggested by *Network 90*, it is bound to reach the same conclusion here as it did under its previous analysis concerning the fraudulent conveyance claim; BSCC had control over the money in its account. Blachford transferred the money to BSCC without any express conditions or legal restrictions on its use. Common sense mandated that BSCC use the money to pay the Bowers if it wanted the asset sale to close, Blachford did not require it. There was nothing which prevented BSCC from using the money elsewhere. The limited inferences which can be drawn from the facts cited by the Bowers in support of their claim that Blachford controlled the payment to the Bowers, (as more fully discussed under § 548(a)(2)), are insufficient to establish the degree of control required to support the earmarking doctrine.

In order to recover under § 547, BSCC must also establish that the transfer was 1) To or for the benefit of a creditor; 2) on

account of an antecedent debt; 3) made while the debtor was insolvent; 4) made within 90 days of bankruptcy; 5) enabled the creditor to receive more than that creditor would have received in a Chapter 7. 11 U.S.C. § 547(b); *In re Energy Cooperative, Inc.*, 832 F.2d 997 (7th Cir.1987).

■ BSCC claims that the portion of the settlement payment which represented amounts owed by BSCC under the Consulting Agreement was a payment to a creditor on account of an antecedent debt. In order to determine whether a payment is on account of an antecedent debt, it is necessary to determine when the debt was incurred. The Seventh Circuit determined in *ECI*, that a debtor has incurred a debt when a creditor has a claim against the debtor "even if the claim is unliquidated, unfixed, or contingent." *ECI* at 1001. In this case BSCC claims, as the trustee in *ECI* did, that the debt was incurred when the contract was entered into. Although the Seventh Circuit did not reject this argument, it noted that this conclusion would conflict with decisions reached in two other circuits. In order to avoid this conflict, the court concluded that the debt was incurred when the contract was repudiated, which under the Uniform Commercial Code immediately allowed the aggrieved party to "resort to any remedy for breach." *ECI* at 1002.

Based on *ECI*, the creditor has a claim and the debtor has a debt, when the aggrieved party had a right to seek redress for breach. In an April 21, 1989 letter from the Bowers' attorney, the Bowers declared an Event of Default by BSCC's failure to pay money to the Bowers, "includ-

ing, without limitation, medical expenses and other expenses." The expenses expressly mentioned in the letter referred to liabilities on the Consulting Agreement. The declaration of default was reiterated in a May 2, 1989 letter to Blachford's attorney. This letter informed Blachford's attorney that a default had been declared under the Pledge Agreement due to defaults in payments to NBD and defaults in amounts BSCC and MIC owed to the Bowers.[15] The Events of Default under the Pledge Agreement were tied to defaults in the Consulting Agreement. Based on these facts the Bowers had a right to seek redress following a declaration of default under the Consulting Agreement. This occurred on April 21, 1989. BSCC paid the amounts owed on the Consulting Agreement approximately one month later.[16] Therefore BSCC's obligations under the Consulting Agreement was a debt antecedent to the settlement payment.

■ The Bowers contend that the entire payment made pursuant to the Settlement Agreement was supported by new consideration; the release of the stock. This raises the contemporaneous exchange for new value defense under § 547(c)(1). To establish the § 547(c)(1) defense the Bowers have the burden of proving that the 1) transfer was intended to be a contemporaneous exchange; 2) the transfer was in fact "a substantially contemporaneous exchange"; and 3) the transfer was for "new value given to the debtor." "New value" is defined by § 547(a)(2) as including the "release of property previously transferred

**15.** The Bowers maintain that they did not declare a default against BSCC. From the record it is clear that this position is not correct. The April 21, 1989 letter claimed an Event of Default "based upon the failure by the Company and Metcalf to pay monies owed to or on behalf of the Bowers, including, without limitation, medical and other expenses." The May 2, 1989 letter declared a default under the Pledge Agreement and also claimed: "In addition to the above, amounts which the BSCC and MIC were to pay to or on behalf of the Bowers have not been paid. This also constitutes an Event of Default." Plaintiff's Exhibits 19 and 21 to Statement of Material Facts.

**16.** The amount which the Bowers claimed and were later paid, was based on all obligations under the Consulting Agreement being accelerated through the term of the agreement, which was extended through August 1992. The Bowers argue that because BSCC's obligation to pay for the services had not arisen when the payment was made that there was no antecedent debt. This argument is without any merit. If BSCC had no obligation to pay for the services and the Bowers had not accelerated amounts owed under the Consulting Agreement, then why did BSCC pay Earl Bower the full amount he claimed due under the Consulting Agreement.

to such transferee in a transaction that is neither void nor voidable."

The Bowers cite *In re C.P.P. Export and Import, Inc.*, 132 B.R. 962 (D.Kan.1991) in support of their position that a stock redemption by a corporation constitutes new value for purposes of § 547(c)(1). In *C.P.P.* the debtor corporation redeemed a shareholders 40% interest in exchange for the corporation's inventory. The corporation had a commitment from a third party to purchase the stock at the time of redemption. Although this case appears to support the Bowers position that the return of the stock provided new value for the payment under the Settlement Agreement, this transaction fails to satisfy an express provision of the contemporaneous exchange defense.

 Section 547(c)(1)(A) expressly provides that the new value must be given *"to the debtor."* The stock was not transferred to the debtor in this case, it was returned to MIC, the shareholder. The consideration that was provided to the debtor was the benefit in obtaining the release of the stock, while this benefit provided value for purposes of the fraudulent conveyance claim it does not constitute "new value" for purposes of § 547(c)(1). The only consideration in this transaction which qualifies as new value under § 547(a)(2) is the stock and that was not "given to the debtor." Consequently neither the return of stock to MIC nor the benefit to BSCC in having the stock released provided "new value to the debtor" as required by § 547(c)(2)(A).

The issue, whether "new value" must be provided directly to the debtor under § 547(c)(1), has not been raised frequently. *In re Dick Henley, Inc.*, 38 B.R. 210 (Bkrtcy.M.D.La.1984), considered this precise issue but reached a contrary conclusion. The debtor in *Henley* was a general contractor who paid a subcontractor during the preference period. Following the payment the subcontractor released its mechanics' lien claim against the owner, who in turn released its claim of indemnity against the debtor. The court held that the release of a lien by a third party constituted "new value to the debtor." In reaching this conclusion the court had to address two sub-issues; whether the definition of "new value" was exclusive and whether the "new value" had to be provided directly to the debtor.

On the first issue the court concluded that the definition of new value was not meant to be exclusive.[17] Consequently it concluded that the definition of new value could include the release of the owner's right of indemnity against the debtor, even though this was not listed in the definition of new value in § 547(a)(2). *Henley* at 213. Next, the court considered the provision of section § 547(a)(2) which defined new value as the release of property previously transferred. It held that the lien rights, which were released by the subcontractor, fit this definition of new value. However, there was a problem in treating the release of lien rights as new value, as § 547(c)(1) required the new value be given to the debtor and the release of lien rights was given to the owner, not the debtor. The Court looked at § 547(c)(4) which also uses the concept of new value. Section § 547(c)(4), however, provides that the new value can be given "to or for the benefit of the debtor." The Court then resolved the problem resulting from the fact that the new value was not given directly to the debtor by interpreting § 547(c)(1) the same way as § 547(c)(4). The court determined that the two sections should be read the same because it said: "There is no apparent reason for this difference in language, and such a reading would appear to be incongruous...." *Henley* at 214.

This Court disagrees with *Henley's* interpretation of § 547(c)(1). The fact that Congress included the language "or for the benefit of the debtor" in section § 547(c)(4) but not in § 547(c)(1), establishes that it knew how to include an indirect benefit but chose not to do so in § 547(c)(1). Where Congress has chosen to allow an indirect

---

**17.** This interpretation has been rejected by numerous courts including the 7th Circuit. See *In re Energy Co–Op.*, supra, at 1003: "By using 'means' instead of 'includes' in § 547(a)(2), Congress created an exclusive, rather than open-ended, definition for new value."

benefit in one section of a statute but not another, it is not the province of this Court to change the statute by reading language into a section.

The *Henley* decision has been rejected by other courts on several different basis.[18] Only one court, *In re H & S Transp. Co.*, 80 B.R. 441 (Bkrtcy.M.D.Tenn.1987), rev'd on different grounds 90 B.R. 309 (M.D.Tn. 1988), addressed the specific issue of whether § 547(c)(1) encompasses new value given for the benefit of a third party. *H & S* also declined to give such an expansive reading to § 547(c)(1). Accordingly, this Court concludes that the release of property to a third property does not provide "new value to the debtor" as required by § 547(c)(1). Furthermore, the benefit to BSCC in having the stock released to MIC so that the stock could be voted in favor of the asset sale to Blachford, is not new value within the definition of § 547(a)(2). Consequently, the contemporaneous exchange for new value defense is not available to the Bowers under the facts of this case.

Because it is clear that the payment to the Bowers enabled them to receive more than they would have in a Chapter 7, Earl Bower received 100% of the amounts due under the Consulting Agreement, the only issue remaining is whether BSCC was insolvent at the time of the transfer. The debtor is presumed insolvent during the 90 days preceding bankruptcy. 11 U.S.C. 547(f). The Bowers have the burden of proving that BSCC was solvent when the transfer occurred. 11 U.S.C. 547(f); *In the Matter of Taxman Clothing Co.*, 905 F.2d 166, 168 (7th Cir.1990). A balance sheet test of solvency is used under § 547(b). 11 U.S.C. 101(31); *Taxman Clothing* at 170.

To rebut the presumption of insolvency the Bowers rely on the January 31, 1989 balance sheet which shows a net worth of $1,094,401.12. Cook testified that the January 31, 1989 balance sheet is incorrect, that it contains a note receivable of $1,700,-000.00 from MIC that is uncollectible and fails to report a long term liability of $650,-000 for the debt incurred to acquire Flo-Lube and Diamond Shamrock.[19] When these adjustments are taken into consideration, BSCC had a negative net worth of $1,329,514.00. Based upon this evidence it is clear that BSCC was insolvent, as that term is defined in § 101(31), On January 31, 1989. The issue, however, is not whether BSCC was solvent or insolvent on January 31, 1989, but whether BSCC was solvent or insolvent when the transfer occurred. So even if the Bowers had succeeded in establishing that the January 31, 1989 balance sheet was correct, they still would not have rebutted the presumption of insolvency that exists during the preference period.

The Bowers point to testimony from Cook, where he said that BSCC was solvent on May 18 and 19, 1989. There is nothing in this testimony which indicates Cook was discussing balance sheet solvency/insolvency. Furthermore, Cook explained later in his testimony, that when he made the statement that BSCC was solvent on May 18, 1989 he included the $1.7 million note receivable due from MIC. Cook testified that if this note were eliminated, then BSCC was insolvent on May 18, 1989.

The Bowers admit that they did not have access to BSCC's financial data after August 1985. Consequently, the only evidence the Bowers have to rebut the presumption of insolvency is evidence adduced through discovery. As the above discus-

---

**18.** See *In re Hatfield Electric Co.*, 91 B.R. 782 (Bkrtcy.N.D. Ohio 1988), *In re Chase & Sanborn*, 904 F.2d 588 (11th Cir.1990) and *In the Matter of Fuel Oil Supply & Terminaling, Inc.*, 837 F.2d 224 (5th Cir.1988).

**19.** The Bowers do not dispute this testimony, but argue that BSCC should not be allowed to contradict balance sheets which were filed with BSCC's income tax returns. After considering the entire record in this case, this Court accepts Cook's testimony on the uncollectability of the

note. MIC was BSCC's parent company, its only substantial asset was the BSCC stock, consequently it is reasonable to conclude that MIC did not have the ability to pay a $1.7 million note. It is also clear from the Diamond Shamrock and Flo-Lube asset purchase agreements and the fact that these companies were paid from the proceeds of the sale of BSCC's assets, that the debts for these acquisitions were liabilities of BSCC.

sion indicates this evidence is insufficient to rebut the presumption of insolvency. When the January 31, 1989 balance is properly adjusted it is clear that BSCC was insolvent, no balance sheets were produced to show that BSCC was solvent during the preference period. Cook's testimony regarding BSCC's solvency/insolvency establish that there was no material change in BSCC's financial status between January 31, 1989 and May 18, 1989, and that if the same adjustments are made to reflect the uncollectible $1.7 million note, BSCC was insolvent. Consequently, this Court concludes that the Bowers failed to rebut the presumption of insolvency that exists during the preference period under § 547(f). This was the final element necessary to establish an avoidable preference. Accordingly, this Court will grant BSCC's motion for summary judgment.

### Trust Fund Theory

BSCC moved for summary judgment on its claim that the funds distributed to the Bowers must be returned to the corporation pursuant to the common law trust fund doctrine. The Bowers brought a cross motion for summary judgment and a motion to dismiss for failure to state a cause of action on this theory.

■■■ Under the trust fund doctrine, a corporation's property is considered a trust for the payment of the corporation's debts. When property is distributed to shareholders they hold the property subject to the claims of creditors of the corporation. *Blankenship v. Demmler Mfg. Co.*, 44 Ill.Dec. 787, 789, 411 N.E.2d 1153, 1158, 89 Ill.App.3d 569 (1st.Dist.1980).

■■ The trust fund doctrine has very limited application. It is an equitable remedy, developed to protect creditors of dissolved corporations. *Blankenship* 44 Ill. Dec. at 789, 411 N.E.2d at 1153. Illinois Courts have never applied the doctrine to bankrupt or otherwise financially distressed corporations. Consequently, this Court concludes that the trust fund doctrine is not available here where the corporation has not been dissolved but has filed for bankruptcy. The doctrine was developed to protect creditors who were other-

wise without a remedy. Where the corporation has filed for bankruptcy creditors have several remedies available to them under the Bankruptcy Code and non-bankruptcy law. Accordingly, the Bowers cross motion for summary judgment on the trust fund claim is granted.

### CONCLUSION

There is a genuine issue of material of fact on the value of the benefit BSCC received in obtaining a release of its stock from the Bowers. This issue is determinative of whether BSCC received reasonably equivalent value under § 548(a)(2)(A) and adequate consideration under Ill.Rev.Stat. ch. 59, ¶ 4. Accordingly, BSCC's motion for summary judgment on these claims must be denied.

BSCC has established that $281,900.68 of the settlement payment, which represented payment for amounts BSCC owed the Bowers on the Consulting Agreement, was an avoidable preference under § 547(b). There are no genuine issues of material fact that will affect the outcome of this decision. Consequently, summary judgment on BSCC's motion is granted.

The common law trust fund doctrine is an equitable remedy developed for creditors of dissolved corporations. BSCC has not been dissolved, consequently BSCC can not prove facts required to support recovery under the trust fund doctrine. Accordingly BSCC's motion for summary judgment on the trust fund doctrine must be denied and the Bowers cross motion for summary judgment on the same granted.

An order will be entered in accordance with this Opinion.