In re PHAR–MOR, INC. SECURITIES LITIGATION.

OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF PHAR–MOR, INC. and Fifteen Affiliated Companies, Plaintiff,

v.

ACTION INDUSTRIES, INC., et al., Defendants.

OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF PHAR–MOR, INC. and Fifteen Affiliated Companies, Plaintiff,

v.

PNC VENTURE CORP., et al., Defendants.

Civ. A. Nos. 92–1938, 94–2077 and 94–2076. MDL No. 959. Master File No. Misc. 93–96.

United States District Court, W.D. Pennsylvania.

Aug. 22, 1995.

David Murphy, Pepper, Hamilton & Scheetz, Detroit, MI, Harry W. Greenfield, Cleveland, OH, for Official Committee and Unsecured Creditors.

Edwin L. Klett, Pittsburgh, PA, for Westinghouse.

James H. McConomy, Pittsburgh, PA, for DeBartolo.

## *OPINION*

ZIEGLER, Chief Judge.

Plaintiff, Official Committee of Unsecured Creditors of Phar–Mor, Inc. and Fifteen Affiliated Companies (the "Committee"), brings these actions on behalf of the debtor, Phar–Mor, Inc., and its creditors to recover from defendants, who are or were Phar–Mor shareholders, approximately $72.2 million that Phar–Mor paid to defendants in August of 1991 to repurchase shares of Phar–Mor stock. Pending before the court are cross-motions for summary judgment filed by the parties.

These actions, which allege that defendants were the beneficiaries of fraudulent transfers in violation of the Bankruptcy Code and certain state fraudulent conveyance laws, were initially filed in the United States Bankruptcy Court for the Northern District of Ohio before being transferred to this court by the Judicial Panel on Multidistrict Litigation for inclusion in *In re Phar–Mor, Inc. Securities Litigation,* MDL No. 959 (W.D.Pa.). Phar–Mor, a deep discount drugstore chain, filed for bankruptcy on August

17, 1992, shortly after publicly revealing that certain of its high-level management employees had engaged in a fraud at the company.

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In considering a motion for summary judgment, we must examine the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986).

The facts underlying the Committee's claims are generally undisputed and are as follows. Phar–Mor, a privately-held company, was formed in 1982 as a wholly-owned subsidiary of Giant Eagle, Inc. Almost from the time of its inception and until it filed for bankruptcy, Phar–Mor engaged in an aggressive expansion program whereby it grew from 12 stores in 1985 to 311 stores at the time of the bankruptcy filing. To finance this expansion, Phar–Mor often obtained capital by, *inter alia,* selling shares of its stock to accredited investors. In the spring of 1991, Phar–Mor decided to attempt to raise approximately $125 million in new capital by selling its stock to qualified institutional investors through the mechanism of a private placement offering. In early May 1991, Phar–Mor issued a private placement memorandum seeking to place 4.5 million shares of stock at a price of $28 share, for total net proceeds of approximately $122,400,000.00.

In April of 1991, David Shapira, Phar–Mor's Chairman and Chief Executive Officer, met with Corporate Advisors, L.P., the general partner of the Corporate Partners investment fund, to determine whether Corporate Partners would be interested in investing in Phar–Mor. After performing an investment analysis of Phar–Mor, Corporate Partners agreed to purchase the entire $125 million of equity that Phar–Mor was planning to sell in the May offering. The draft stock purchase agreements reveal that Corporate Partners contemplated purchasing $125 million in stock directly from Phar–Mor plus an additional $75 million worth of shares from two of Phar–Mor's shareholders who had expressed an interest in selling part of their equity in the company, namely, Westinghouse Credit Corporation and the Edward J. DeBartolo Family Limited Partnership ("DeBartolo").

The structure of the deal that was eventually executed between Corporate Partners and Phar–Mor was modified from the original draft agreements to provide that Corporate Partners would pay $200 million directly to Phar–Mor and Phar–Mor would then use $75 million of that amount to repurchase shares from its existing shareholders by way of a tender offer. A number of factors were responsible for the modification, including Shapira's belief that all of Phar–Mor's shareholders should have an opportunity to participate in the liquidity opportunity and Corporate Partners' desire to avoid any possible liability that could arise from a direct purchase under the securities laws due to the relatively superior knowledge that Corporate Partners' gained of Phar–Mor's financial condition during its due diligence efforts. In addition, Corporate Partners wanted its entire investment protected by the representations and warranties made by Phar–Mor in the stock purchase agreement.

In light of these concerns, the stock purchase agreement that was executed on June 27, 1991 provides that:

> The Company [Phar–Mor] hereby covenants to the purchasers that, promptly after the Closing Date (and in no event later than July 23, 1991), it shall commence an offer to purchase Company Units and/or shares of Common Stock, upon the terms and subject to the conditions set forth below ...; it being acknowledged and agreed that the Company shall not purchase pursuant to the Company Offer a number of Company Units and/or shares of Common Stock which shall require the payment of more than $75,000,000 in the aggregate (the "Offer Limit").

Stock Purchase Agreement, § 8 (bracket

supplied).[1] The agreement also required Phar–Mor to:

> use the proceeds from the issuance and sale of the shares of the Common Stock and Warrants hereunder solely for the following purposes: (1) to pay down such portion of its outstanding indebtedness and obligations under the Credit Agreement as the Company shall reasonably determine; (2) for working capital and general corporate purposes; (3) to pay all fees, costs and expenses related to this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby ...; and (4) *to fund the Company Offer referred to in Section 8(a) hereof, and all fees and expenses thereof*....

Stock Purchase Agreement, § 5(e) (emphasis supplied).

The preamble of the stock purchase agreement provides that Phar–Mor's covenant to conduct the tender offer was a "material inducement" to Corporate Partners' decision to invest in Phar–Mor. Indeed, the agreement contained a provision which, in the event that Phar–Mor would have failed to repurchase at least $50 million worth of shares in the tender offer, gave Corporate Partners the right to sell up to $50 million worth of stock back to Phar–Mor. Stock Purchase Agreement, § 8(b)(I).

Prior to entering into the stock purchase agreement, Corporate Partners required Phar–Mor to obtain commitments from certain significant Phar–Mor shareholders that they would each tender minimum specified quantities of Company Units to ensure that the tender offer would be fully subscribed. In response, and prior to the closing of the sale to Corporate Partners, Phar–Mor received letters from these shareholders setting forth commitments to tender quantities which, in total, exceeded $75 million, that is, the value of the proposed tender offer. In light of these commitments, Phar–Mor was able to assure Corporate Partners that the tender offer would be fully subscribed.[2]

The sale to Corporate Partners was closed on June 27, 1991 and the proceeds from the sale were deposited in Phar–Mor's concentration account, where they were commingled with other funds previously and subsequently deposited into the account. Phar–Mor had unfettered access to and control over the money, subject only to the provision in the stock purchase agreement that it use a portion of the proceeds to finance the tender offer. Despite this restriction, Phar–Mor applied the bulk of the proceeds to its revolving line of credit and the rest was transferred to other accounts for general corporate use, including inventory purchases.

In accordance with its obligations under the stock purchase agreement, Phar–Mor announced the $75 million tender offer on July 23, 1991. Because the amount received by the shareholders was reduced to reflect the shareholders' payment of their *pro rata* share of the fees and expenses incurred by Phar–Mor in connection with the Corporate Partners transaction, the actual cost of the tender offer to Phar–Mor was approximately $72.2 million. The defendants in this action are the shareholders that received the funds from Phar–Mor in connection with the tender offer.

Although Corporate Partners invested $200 million in Phar–Mor, it is not disputed that Phar–Mor was to receive only $125 million in new equity from the stock sale and was obligated to use $75 million of the proceeds to pay for the tender offer. Frederick Green, counsel for Corporate Partners testified at his deposition as follows:

> Well, the intention is that the company's capital would increase after the dust of this transaction settled by $125 million. *The company was to have $125 million available to it for whatever it was looking to use these proceeds for.* Whether you do that in two transactions that are separate, or whether you do it in one transaction, as

---

1. A "Company Unit" is comprised of a share of stock and a warrant to purchase an additional share.

2. We note that Phar–Mor also entered into an agreement with Westinghouse, before the Corporate Partners sale was executed, whereby Phar–Mor agreed to conclude the tender offer no later than July 30, 1991.

we decided to here, is a mechanic that is decided after input from tax lawyers, and securities lawyers, et cetera. But its just a mechanic.

Green Deposition, p. 45 (emphasis added). The testimony of Jonathan Kagan, Corporate Partners' managing director, is consistent with Green's:

> I believe that at the time we closed the transaction it was our view that it was in all of the shareholders' interests that the company raise new equity in the amount of in the order of $125 million. The $75 million to repurchase other shareholders was a separate decision process.

Kagan Deposition, p. 309. Thus, the net effect to Phar–Mor was, as intended, a capital increase of $125 million along with a $75 million transfer of stock ownership from its existing shareholders to Corporate Partners.

Phar–Mor's treatment of the transactions in its accounting records also indicates that the combined effect of the transactions was to be a $125 million increase in equity. In the audited financial statements for the fiscal year ending June 30, 1991, Phar–Mor reserved the amount of $72,954,000 in the liability account named "stock redemption payable." Note number 9 to the financial statements provides in relevant part that:

> Effective June 27, 1991, the Company entered into a Stock Purchase Agreement (Agreement) with a group of investors unaffiliated with the company.... In connection with the Agreement, the Company agreed to apply up to $75,000,000 of the proceeds raised from the sale to the purchase of its outstanding common stock.

Coopers & Lybrand, Phar–Mor's independent auditors, concurred with Phar–Mor's accounting treatment of the transaction on the basis that "the commitment to repurchase shares existed at June 30, 1991" and, therefore, "equity at June 30, 1991 has been reduced to reflect the entire tender offer...."

The Committee has asserted claims to avoid and recover the amounts paid in the tender offer under a theory of "constructive fraud." Section 548(a)(2) of the Bankruptcy Code provides that:

> The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> \* \* \* \* \* \*
>
> (A) received less than a reasonably equivalent value in exchange for such transfer or obligation;
>
> (B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>
> (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
>
> (iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(2). The Committee has also asserted claims pursuant to 11 U.S.C. § 544, which incorporates state fraudulent transfer laws.[3]

The Committee has moved for partial summary judgment on its claims and, specifically, seeks a judgment in its favor that (1) money was transferred to defendants within one year of Phar–Mor's bankruptcy filing, (2) Phar–Mor had an interest in the money that was transferred to defendants, and (3) Phar–Mor received less than reasonably equivalent value in exchange for the funds transferred. Defendants have also filed a motion for summary judgment and assert that the tender offer does not constitute an avoidable fraudulent conveyance because (1) Phar–Mor did not have an interest in the $75 million transferred to defendants, and (2) Phar–Mor received reasonably equivalent value in exchange for the funds transferred. For the reasons that follow, we will grant the motion of defendants and deny the motion of plain-

---

**3.** We note that the Committee has moved to amend its complaint in the PNC Venture Corp. action to delete its claim under 11 U.S.C. § 550 and to set forth as a separate cause of action its claims under 11 U.S.C. § 544. The motion will be granted.

tiff, and judgment will be entered in favor of defendants.

■ By its terms, section 548 does not apply to transfers of property in which the debtor has no interest. This is consistent with the purpose of the statute, which is to "prevent a debtor from diminishing, to the detriment of some or all creditors, funds that are generally available for distribution to creditors." *Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177, 1181 (11th Cir.1987). Defendants contend that, because Phar–Mor was contractually obligated to use $75 million of the $200 million invested by Corporate Partners to pay for the tender offer, it had no interest in the $75 million and the funds were never available to Phar–Mor's creditors.

On the other hand, the Committee asserts that Phar–Mor must be deemed to have had an interest in the entire $200 million primarily because, as rehearsed, the money was deposited in Phar–Mor's concentration account and which Phar–Mor had unfettered access and control. Plaintiff contends that, because the $75 million in question was not segregated from other funds of Phar–Mor and was used by Phar–Mor for general corporate purposes, Phar–Mor had a property interest in the $75 million. The Committee argues that, under these circumstances, defendants cannot establish that the money was "earmarked" for defendants or that Phar–Mor was a "mere conduit" from which the money would flow from Corporate Partners to defendants.

In *In re Chase & Sanborn Corp., supra,* the Court of Appeals rejected the creditor trustee's contention that, because the debtor had possession of the funds in question and, therefore, some control over them, the funds were part of the debtor's property. In that case, which involved an illegal money laundering scheme, the president and sole shareholder of a limited partnership, which in turned owned all of the stock of the debtor, personally borrowed money from a bank. A portion of the proceeds from the loan was transferred to an account of the debtor which had been reopened solely for the purpose of laundering the money that had been deposited into it. Approximately half of the money

was used to pay salaries and lawyers fees of the debtor, while the other half was used to pay a personal debt of the president. As the court recognized, "the actual connection between the funds and the debtor was quite tangential: a two-day layover in a special account then only recently opened and soon thereafter closed. The account, moreover, was opened under a name the debtor no longer used." *Id.* at 1182.

In rejecting the trustee's claim under § 548(a)(2), the court stated that:

we conclude that where a transfer to a noncreditor [of the debtor] is challenged as fraudulent, more is necessary to establish the debtor's control over the funds than the simple fact that a third party placed the funds in an account of the debtor with no express restrictions on their use. In determining whether the debtor had control of funds transferred to a noncreditor, the court must look beyond the particular transfers in question to the entire circumstance of the transactions.

\*　　\*　　\*　　\*　　\*　　\*

neither the use by the debtor of some of the funds for its own purposes nor the fact that the debtor's president ordered the transfer can overcome the overwhelming evidence that [the president, and not the debtor], controlled the transfer at issue. Accordingly, we conclude that the funds were not the property of the debtor, and thus that the transfer is not avoidable. To conclude otherwise would confer on the creditors a windfall at the expense of the named defendants, who, as the creditor trustee admits, were innocent of any intent to diminish the assets of the debtor.

*Id.* at 1181–82 (brackets supplied).

Defendants contend that *Sanborn* supports the contention that Phar–Mor did not control the $75 million used in the tender offer. On the other hand, the Committee contends that, because, with respect to the $200 million, Phar–Mor "held complete legal title, all indicia of ownership, and unfettered discretion to pay creditors of its own choosing, including its *own* creditors," *In the Matter of Southmark Corp.,* 49 F.3d 1111, 1116 (5th Cir.1995) (emphasis in original), the facts of this case

are distinct and the holding in *Sanborn* is not applicable. Although the language of *Sanborn* would seem to support the position of defendants, we need not rule on this issue because we hold that defendants are entitled to summary judgment on another basis.

As explained, the Committee may not avoid a transfer or obligation of the debtor under section 548 unless it can establish that the debtor received less than reasonably equivalent value in exchange for the transfer or obligation. As the Court of Appeals stated in *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979 (2d Cir.1981):

> The reason for this requirement is obvious: if the debtor receives property or discharges or secures an antecedent debt that is substantially equivalent in value to the property given or obligation incurred by him in exchange, then the transaction has not significantly affected his estate and his creditors have no cause to complain.

*Id.* at 991.

Defendants argue that, in determining whether Phar–Mor received reasonably equivalent value from the tender offer, we must collapse the Corporate Partners sale and the tender offer into a single transaction to assess their true impact upon the debtor. *See United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302 (3d Cir.1986), *cert. denied sub nom., McClellan Realty Corp. v. United States*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987). We agree.

In our view, the two transactions must be treated as a single transaction for purposes of determining the overall effect on the debtor for the following reasons:

(1) the stock purchase agreement requires Phar–Mor to conduct the tender offer. Moreover, it requires Phar–Mor to use $75 million of the proceeds to pay for the tender offer;

(2) both Phar–Mor and Corporate Partners intended that Phar–Mor would retain only $125 million in additional equity from the sale;

(3) the stock purchase agreement incorporated the tender offer only as a "mechanic" so that Phar–Mor's shareholders could obtain some liquidity and also so Corporate Partners could make a larger investment in Phar–Mor without dealing directly with the shareholders or running the risk of a securities law liability based on its extensive due diligence investigation;

(4) Phar–Mor had commitments from its shareholders to purchase more than $75 million prior to the closing of the Corporate Partners deal;

(5) the shareholders that participated in the tender offer were charged a *pro rata* share of the company's costs in connection with the *Corporate Partners transaction*; and

(6) Phar–Mor's financial statements treated the Corporate Partners' purchase and the tender offer as parts of a single transaction.

These factors establish that the two exchanges at issue were part of an integrated transaction undertaken by Phar–Mor for the purpose of raising $125 million in capital. *See Morse Operations, Inc. v. Goodway Graphics of Virginia (In re Lease–A–Fleet, Inc.)*, 155 B.R. 666, 676 (Bkrtcy.E.D.Pa.1993) ("Each of the circular financial transactions between the parties in issue must therefore be 'collapsed' into one transaction to appreciate their impact upon the Debtor. When each circle of cash is viewed as a single transaction, it is clear that the same monies simply passed through from [parent] to Debtor to the [affiliate]"). Thus, we will not examine the tender offer in isolation, rather, we will analyze the net effect of the integrated transaction upon the debtor.

In *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635 (3d Cir. 1991), *cert. denied*, 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992), the Court of Appeals stated that the "touchstone" in evaluating whether the debtor has been given reasonably equivalent value is:

> whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred. Thus, when the debtor is a going concern and its realizable going concern value after the transaction is equal to or exceeds its going concern value before the transaction, rea-

sonably equivalent value has been received.

*Id.* at 647. In other words, if "the net effect of the transaction on the debtor's estate is demonstrably insignificant, for he has received ... either an asset or the discharge of a debt worth approximately as much as the property he has given up or the obligation he has incurred," the debtor will be deemed to have received reasonably equivalent value from the transaction.

In the case at bar, the effect of the integrated transaction between Phar–Mor, Corporate Partners and defendants was a net financial gain for Phar–Mor of $125 million in new equity, plus payment by defendants of Phar–Mor's costs and expenses in the deal. As stated, the stock purchase agreement provides that the obligation undertaken by Phar–Mor to make the tender offer to defendants was a "material inducement" in Corporate Partners' decision to invest in the company. Thus, we hold that, on this factor alone, Phar–Mor received reasonably equivalent value, albeit indirectly, from the tender offer, to-wit, Corporate Partners' $125 million investment.

■ The Committee argues that, because Corporate Partners would have likely invested $125 million even in the absence of the tender offer, the investment can not be deemed consideration for the transfer of funds to defendants. In other words, the Committee would have us ignore the express provisions of the stock purchase agreement and rule that the tender offer was not a material inducement to Corporate Partners' investment. We will not do so.

Even if we were to conclude that the $125 million was not consideration for the tender offer, we would still hold that Phar–Mor received reasonably equivalent value from the exchange. It is undisputed that Corporate Partners initially agreed to invest $125 million into Phar–Mor. That amount increased by $75 million to a total of $200 million only when Phar–Mor agreed to make a $75 million tender offer to its existing shareholders. The Committee can point to no evidence that would suggest that Corporate Partners

would have invested the entire $200 million in the absence of Phar–Mor's obligation to conduct the tender offer. Therefore, Phar–Mor received $75 million specifically because it agreed to make the tender offer. This constitutes dollar-for-dollar consideration to Phar–Mor in exchange for its obligation to transfer $75 million to defendants, and the net effect of the transactions, including the assumption by defendants of Phar–Mor's costs and expenses, is an increase in corporate net worth.

In essence, Phar–Mor was paid by defendants to transfer $75 million from Corporate Partners to defendants. Under these circumstances, we hold that the tender offer has "not significantly affected [the] estate and [Phar–Mor's] creditors have no cause to complain." *Rubin, supra,* at 991; *see also, Corporate Jet Aviation, Inc. v. Vantress (In re Corporate Jet Aviation, Inc.),* 57 B.R. 195 (Bkrtcy.N.D.Ga.1986), *aff'd,* 82 B.R. 619 (N.D.Ga.1987), *aff'd* 838 F.2d 1220 (11th Cir. 1988) (debtor received reasonably equivalent value because the challenged stock redemption was a requirement of a contemporaneous asset sale by the company).

In our judgment, the estate would be unjustly enriched if the Committee were permitted to recover the transfers made by Phar–Mor, and the purposes underlying section 548 of the Bankruptcy Code would not be served. The express provisions of the stock purchase agreement make clear that $75 million of the $200 million invested by Corporate Partners was intended to merely pass through Phar–Mor to defendants. None of the parties involved expected Phar–Mor's equity to increase by $200 million as a result of the sale. Phar–Mor contracted for an infusion of capital in the amount of $125 million and, when the "dust settled," that is what it got. Were we to hold that the estate is entitled to the entire $200 million, the estate, and Phar–Mor's creditors, would receive a $75 million windfall at the expense of defendants.

■ For the reasons stated, judgment will be entered in favor of defendants on each of the claims asserted by the Committee.[4] An appropriate written order will follow.

4. Our holding that Phar–Mor received reason-    ably equivalent value also requires that we enter

## ORDER OF COURT

IT IS ORDERED that the motion of plaintiff, Official Committee of Unsecured Creditors of Phar–Mor, Inc. and Fifteen Affiliated Companies, for leave file an amended complaint be and hereby is granted.

IT IS FURTHER ORDERED that the motion of defendants, Action Industries, Inc., *et al.* and PNC Venture Corp., *et al.*, for summary judgment be and hereby is granted. Judgment be and hereby is entered in favor of all defendants and against plaintiff, Official Committee of Unsecured Creditors of Phar–Mor, Inc. and Fifteen Affiliated Companies, on plaintiff's claims under 11 U.S.C. §§ 544 and 548.

IT IS FURTHER ORDERED that the motion of plaintiff for summary judgment be and hereby is denied.

judgment with respect to the state law fraudulent transfer claims that plaintiff has asserted under either Pennsylvania or Ohio law. *See* 39 Pa. C.S.A. § 353 (repealed); *13 Ohio Rev.Code Ann.* §§ 1336.04(A)(2), 1336.05(A) (Baldwin 1994). Moreover, because the factors relevant to our decision are identical with respect to each defendant, we will enter judgment in favor of all defendants, including those that have neither moved for summary judgment nor joined in defendants' motion.