In re ROCO CORPORATION, d/b/a
Standard Supply Company, Debtor.

Edward CONSOVE, Plaintiff, Appellant,

v.

Avram COHEN, Defendant, Appellee.

No. 82–1581.

United States Court of Appeals,
First Circuit.

Argued Dec. 10, 1982.

Decided March 2, 1983.

John F. Bomster, Providence, R.I., with whom Russell D. Pollock, and Adler Pollock & Sheehan Incorporated, Providence, R.I., were on brief, for plaintiff, appellant.

Robert J. McGarry, Providence, R.I., with whom Edward J. Regan, and Tillinghast,

Collins & Graham, Providence, R.I., were on brief, for defendant, appellee.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, and SMITH,* Senior District Judge.

BOWNES, Circuit Judge.

Appellant Edward Consove (Consove) appeals from a judgment of the United States Bankruptcy Appellate Panel, 21 B.R. 429, which affirmed a decision of the United States Bankruptcy Court, 15 B.R. 813 for the District of Rhode Island. This decision concerned two transfers of funds to Consove from Roco Corporation (Roco), a corporation subject to an involuntary proceeding under chapter 7 of the Bankruptcy Code. Consove maintains that the bankruptcy court erred in finding that a $300,000 note and security interest he received from Roco in exchange for stock constituted a fraudulent transfer and in finding that $26,158.95 he received from Roco was a voidable preference. For the reasons discussed below we affirm the bankruptcy court's judgment as affirmed by the appellate panel.

I. *Facts and Proceedings Below*

Consove and his partner Arthur Rosen incorporated Roco in 1946; each one owned fifty percent of the company's outstanding stock. Roco, doing business as Standard Supply Company, operated a hardware supply business. Consove was the "inside man" who took care of purchases and accounts receivable while Rosen handled sales. The company appears to have been a marginal one, but generally paid its bills as they came due and provided reasonable salaries for Consove and Rosen.

Rosen died in February 1978 and Roco redeemed his stock for approximately $130,-000, funded in part by insurance proceeds.[1] As a result of this redemption Consove be-

---

* Of the District of Montana, sitting by designation.

1. It appears that approximately $100,000 of this redemption price related to Rosen's stock interest and $30,000 was in repayment of a loan Rosen had made to the company. Neither the bankruptcy court nor the appellate panel, however, made this distinction; instead, they seem to have classified the entire $130,000 as in redemption of Rosen's stock interest. For the purposes of this opinion we accept this version of the transaction.

came the sole shareholder of Roco. Soon thereafter Consove and his son Gerald discussed the possibility of Gerald taking over the business and Consove retiring. Gerald had been a full-time employee of Roco since 1970 and a part-time employee before that. During these years Rosen had displayed little confidence in Gerald's ability to manage the company and Gerald had not been given any position of responsibility or ownership.

The discussions between Consove and Gerald resulted in a series of transactions executed on November 1, 1979. Consove sold his 100 shares of Roco, representing all of the company's outstanding stock, back to the company in exchange for a $300,000 note. The note provided for interest at ten percent annually payable on a monthly basis or, at Roco's option, on a weekly basis at $600 per week plus a year-end adjustment. This weekly amount approximated Consove's salary and expense benefits before retirement. During the first five years only interest was due on the note, with principal to be amortized thereafter over fifteen years by monthly payments. Along with the note Consove took a security interest in all of Roco's personal property, including inventory, accounts receivable, and equipment;[2] a financing statement was filed with the Rhode Island Secretary of State. Roco also executed a secured note to Consove for $29,558.13 to cover an earlier loan Consove had made to the company.[3] On the same date Gerald became the sole shareholder of Roco by purchasing a single share for $3,000 and also became the sole officer and director; Consove resigned as director and president. Consove and his wife signed a letter to Gerald stating that they would not transfer the $300,000 note and that any outstanding balance would be given to Gerald at the death of the surviving parent.

Consove and his wife then retired to Florida. He apparently had little contact with Roco, other than receiving $600 weekly interest payments, until January 1980 when Gerald telephoned to request a $15,000 loan to cover the company's cashflow shortfalls caused by slow collections of accounts receivable. Consove loaned Roco the amount requested. Apparently this situation was not unusual: Consove had made such loans to the company during the years he had managed it. He cashed a check in full payment of this latest loan on June 13, 1980.

A fire in June 1980 forced Roco to close its warehouse. Consove returned to Rhode Island in July when his weekly payments of $600 stopped; up to this point he had received interest payments totalling $21,600. Consove took back control of the business from Gerald and soon confirmed his suspicion that his son had been mismanaging Roco and diverting its funds for personal use.[4] Consove confronted Gerald about this diversion of funds and had him execute a personal note of $27,000 to the order of Roco. In his capacity as Roco's president Gerald endorsed this note to Consove. It has not been paid.

Between the time Consove reassumed control of Roco and September 23, 1980, the date an involuntary bankruptcy petition was filed, he caused the corporation to issue him six checks totalling $36,886.69. According to Roco's books, $26,159.95 of this amount was applied to the balance due Consove for officer loans and the remaining $10,727.74 was applied to reduce the principal balance on the $300,000 note to $289,272.26.

After the filing of the bankruptcy petition, Consove filed a complaint to modify

---

**2.** The bankruptcy court noted that loans Consove made to the business prior to November 1, 1979, had been unsecured.

**3.** Consove concedes that this amount was incorrect and that the actual balance due him on the date of the redemption for officer loans was $26,158.95.

**4.** The appellate panel noted that it is unclear under what authority Consove regained control. Consove maintains that he merely was exercising his rights under the security agreement executed when his stock was redeemed. Consove's Amended Complaint to Modify Stay, however, states that he did not give notice of exercising his rights as a secured creditor until about two months after he assumed control.

the 11 U.S.C. § 362 automatic stay to permit him to continue exercising his rights as a secured creditor, specifically to reclaim Roco's assets. In his answer the Trustee asserted several affirmative defenses and counterclaims. The bankruptcy court rendered a judgment for the Trustee based on the affirmative defense of fraudulent transfer and on his counterclaim seeking avoidance of preferential transfers under 11 U.S.C. § 547. The appellate panel affirmed the bankruptcy court's findings and conclusions on the issues of the fraudulent transfer and preferences. The panel vacated the court's order that Consove turn over to the Trustee Gerald's $27,000 note because there was no support for it in the record and remanded that issue for appropriate proceedings.[5] The Trustee has conducted a public auction of Roco's hardware inventory and is holding the proceeds as well as the estate's remaining assets pending the outcome of this case.

## II. *Fraudulent Transfer*

The bankruptcy court held that the transfer by Roco of the $300,000 note and security interest in redeeming its stock was a fraudulent transfer under 11 U.S.C. §§ 548(a)(1) & (a)(2) (Supp. V 1981).[6] Section 548(a)(1) enables a trustee to avoid any transfer that the debtor made with "actual intent to hinder, delay, or defraud" creditors. Section 548(a)(2) in relevant part provides a standard of constructive fraud which enables the trustee to avoid any transfer in which the debtor "received less than a reasonably equivalent value in exchange for such transfer" and "was insolvent on the date [of such transfer] or became insolvent as a result of such transfer."

The clearly erroneous standard of review provided by Rule 16 of the First Circuit Rules Governing Appeals from Bankruptcy Judges to District Courts, Appellate Panels and Court of Appeals (effective Mar. 1, 1980) seems to apply to our review of the bankruptcy court's findings with respect to both sections 548(a)(1) and 548(a)(2). Consove concedes that there is clear authority for the proposition that the court's finding of actual fraud is a factual finding. *See Collier on Bankruptcy* ¶ 548.-02, at 548–26 (15th ed. 1982) ("The approach under section 548(a)(1) is to be purely factual." (footnote omitted)). The review standard under section 548(a)(2) is not quite as straightforward; that section and its predecessors have been analyzed as intending to provide "a test of a fraud in law as distinguished from fraud in fact." 4 *Collier on Bankruptcy, supra,* ¶ 548.03, at 548–43. At least one court has treated the issue of fair equivalent value as one of law, *see Durrett v. Washington National Insurance,* 621 F.2d 201, 203 (5th Cir.1980). The court stated, however, that it would have reached the same result under the clearly erroneous standard. *Id.* at 204. There is support for viewing the less than reasonably equivalent value and insolvency determinations required by section 548(a)(2) as factual determinations. *See, e.g., Klein v. Tabatchnick,* 610 F.2d 1043, 1047–48 (2d Cir.1979) ("Fairness of consideration is generally a question of fact" and "[i]nsolvency is also a factual question."); *Braunstein v. Massachusetts Bank & Trust,* 443 F.2d 1281, 1284 (1st Cir.1971) (insolvency on date of transfer a question of fact); 4 *Collier on Bankruptcy, supra,* ¶ 548.09, at 548–96 to –97 ("Whether

---

**5.** The appropriate disposition of this $27,000 note has not been raised by the parties on appeal.

**6.** The relevant portions of § 548(a) are as follows:

> (a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor that was made or incurred on or within one year before the date of the filing of the petition, if the debtor—

> (1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer occurred or such obligation was incurred, indebted; or
> (2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> (B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation . . . .

the transfer is for 'reasonably equivalent value' in every case is largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts."). In this case the question of reasonably equivalent value appears to us to be a factual issue to be reviewed under the clearly erroneous standard and the question of insolvency appears at best to be a mixed question. In any event, we would affirm the bankruptcy court's finding on these two issues under either standard of review.

█ In finding that the redemption of Consove's shares of Roco was a fraudulent transfer under section 548(a)(2), the bankruptcy court held that Roco received less than reasonably equivalent value for the $300,000 note and security interest it gave Consove. Indeed, Roco received nothing but all of its outstanding stock. We agree with the bankruptcy court that this stock was virtually worthless to Roco.[7] Under generally accepted accounting principles this treasury stock would be reported on the balance sheet of Roco as a reduction of stockholders' equity, not as an asset. *See generally* R. Anthony & J. Reese, *Accounting Principles* 215 (4th ed. 1979) ("Treasury stock is clearly not an 'economic resource' of an entity."). As the appellate panel noted, treasury stock is a form of shareholder distribution from which the corporation receives no assets. When a corporation purchases treasury stock it reduces its capitalization.[8] Consove argues that the implication of this accounting theory when incorporated into the section 548(a)(2)(A) analysis is that no stock redemption could pass muster under this section. We disagree. It is possible, for example, that a publicly traded corporation with many shares outstanding could redeem a fraction of these shares, perhaps to fund an executive benefits plan or to use in converting convertible bonds or preferred stocks, and receive value as defined in the Bankruptcy Code that would be reasonably equivalent to what it transferred.[9] The implication of the bankruptcy court's holding is merely that when a corporation with one shareholder redeems all of its outstanding stock, the value of this stock in the hands of the corporation is at best questionable.

Consove argues that the only proper measure of the value of the shares transferred to Roco in this redemption is the value of the ownership interest that he forfeited. Even if we were to accept this proposition, and ignore the clear language of section 548(a)(2) that the value to be considered is that received by the debtor and not that forfeited by the transferee, we would still hold that the district court properly found that Roco received less than reasonably equivalent value. Consove points to the Rosen redemption in 1978 as evidence of the value of Consove's ownership interest on November 1, 1979. If we assume that the

7. For cases holding that shares of stock sold back to the corporation were valueless, largely due to the insolvency of the corporation, see *Schafer v. Hammond,* 456 F.2d 15, 17–18 (10th Cir.1972); *Lytle v. Andrews,* 34 F.2d 252, 253–54 (8th Cir.1929); *M.V. Moore & Co. v. Gilmore,* 216 F. 99, 100–01 (4th Cir.1914).

8. On its corporate income tax return for the taxable year ended January 31, 1979, a photocopy of which was included in the appendix to Consove's brief filed with this court, Roco reflected the cost of Rosen's redeemed stock as a reduction of stockholders' equity on its Schedule L Balance Sheet. Although one might argue that Roco had no choice as to how to report the cost of treasury stock on its return, Schedule L requires a taxpayer to disclose balance sheet information as recorded on its financial records. It is evident that the schedule was designed to approximate reporting in accordance with basic generally accepted accounting principles, and that Roco apparently understood the requirements of these principles with respect to reporting the cost of treasury stock when it prepared this return. Moreover, the corporation's balance sheet as of January 31, 1980, reflects the cost of both Rosen's and Consove's redeemed shares as a reduction of stockholders' equity and not as an asset. This manner of reporting reveals the economic substance of treasury stock.

9. The code defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor ...." 11 U.S.C. § 548(d)(2)(A) (Supp.V 1981).

value of Rosen's stock was $130,000 [10] the maximum value of Roco at the time of this redemption would have been $260,000, and after paying for Rosen's shares the value would have fallen to $130,000. Financial statements included in the appendix to Consove's brief filed with this court indicate that Roco's net income for the next two fiscal years totalled less than $30,000—not nearly enough to raise the value of the corporation to the $300,000 face value of the note. Despite Consove's statements to the contrary, we have seen no evidence to rebut the Trustee's prima facie case that reasonably equivalent value is lacking here. Perhaps the best available evidence as to the true worth of Roco on November 1, 1979, when Consove redeemed his shares and retired from active management of the company, was the $3,000 supposedly paid by Gerald for 100% control.

We turn next to the bankruptcy court's finding that the redemption of Roco's shares rendered the corporation insolvent. The Bankruptcy Code defines "insolvency" with respect to a corporate entity as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of ... property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors ...." 11 U.S.C. § 101(26) (Supp. V 1981). The bankruptcy court relied upon expert testimony and the unaudited financial statements of Roco in finding that the corporation was insolvent. The unaudited balance sheet as of October 31, 1979, the day before the redemption, reported assets of $683,503.55 and liabilities of $501,032.98. The redemption increased the liabilities by $300,000 to $801,032.98, substantially higher than the total assets.

■ Consove maintains that the court erred in its reliance on unaudited financial statements because these statements did not accurately reflect the fair value of the company's assets. We have held, however, that unaudited financial statements may be admissible as the best available evidence

and that it is for the trier of fact to assess the accuracy of such statements. *Braunstein,* 443 F.2d at 1284. Consove argues that the unaudited balance sheet is inaccurate for the purpose of determining insolvency because it reflects historical costs and not fair values. For several reasons, however, this historical cost balance sheet approximated the fair value of Roco's assets with sufficient accuracy. First, the balance sheet of Roco was dominated by current assets; for example, cash, accounts receivable, and inventory amounted to over $726,000 of the total assets of $756,439.54 on January 31, 1980. The balance sheet reflected no fixed assets, those assets most affected by the inaccuracies of historical cost accounting. Second, the accounts receivable may actually have been overvalued as there did not appear to have been a reserve for doubtful accounts. Third, and most importantly, there was evidence that the inventory, which amounted to $529,647.08, was not valued at the lower of cost or market as required by generally accepted accounting principles. Instead, the inventory was reported at either retail sales price or the prior year's cost, whichever more accurately reflected fair market value. The bankruptcy court clearly did not err in relying on Roco's unaudited balance sheet to determine that the company was insolvent.

■ Finally, Consove argues that the court erred by not including $100,000 for goodwill in the value of Roco's assets. He correctly states that the fact that goodwill was not disclosed on Roco's balance sheet does not mean that the company did not possess goodwill. Typically goodwill will not be reported on a balance sheet unless there is hard evidence of its existence and value—for example, a balance sheet might reflect the goodwill of a subsidiary which a parent corporation has purchased by paying an amount in excess of the fair value of the subsidiary's assets in an arms' length transaction. *See generally* Anthony & Reese, *supra,* at 24–25. Although goodwill might exist even though not recorded in Roco's

10. *See supra* note 1.

**984**

accounts, Consove provided nothing more than mere self-serving statements to back his goodwill claims. Typical indicators of goodwill, such as a record of highly profitable operation over a period of years, a valuable customer list, or a trade name developed by the company, are not present in this case.

■ Having found that the bankruptcy court did not err in holding that the redemption of Consove's shares of Roco was a fraudulent transfer under section 548(a)(2), we would not normally reach the issue of actual fraud under section 548(a)(1). Like the appellate panel, however, we find that we must address this issue because it plays an integral role in analyzing Consove's claim that he has a valid lien under section 548(c) for any value he actually transferred to Roco.[11] There is a question of whether we should consider this section 548(c) issue because it was not raised before the bankruptcy court; Consove argues that it is not a new issue and that the bankruptcy court should have considered it sua sponte once it found the redemption to be a fraudulent transfer. In any event, we have little trouble finding that the bankruptcy court did not err in its finding of actual fraud and, as a result, that Consove does not have a valid lien under section 548(c).

■ A court may make a finding of fraudulent intent under section 548(a)(1) on the basis of circumstantial evidence; direct proof of the transferor's fraudulent intent will rarely be available. 4 *Collier on Bankruptcy, supra,* ¶ 548.02, at 548–33. We may impute any fraudulent intent of Consove to the transferor Roco because, as the company's president, director, and sole shareholder, he was in a position to control the disposition of its property. *See id.* at 548–30. The substance of the redemption was that the father passed along the ownership interest of Roco to his son and secured for

himself a steady retirement income at his prior salary level, all at the expense of the corporation's creditors. As the appellate panel noted, the stockholder's claim became superior to the claims of trade creditors with the latter receiving no value, but instead having their interests severely impaired. The large discrepancy in value between the note transferred and the stock received strengthens the inference of fraud. *See id.* at 548–37. We cannot say that the bankruptcy court was clearly erroneous in its factual finding of actual fraud. Consove's argument that his $15,000 loan to the corporation in January 1980 evidences his lack of fraudulent intent with respect to creditors is unpersuasive. At this time Consove had a strong motivation to assure the continued operation of Roco because it represented his source of retirement income and his son's source of employment. Fraudulent intent does not require an intent to run the company aground; it requires merely an intent to hinder or defraud creditors.

■ Consove's claim that he is entitled to the saving benefit of section 548(c) must fail once we have found that the bankruptcy court was not clearly erroneous in its finding of actual fraud. Good faith is an "indispensable element" of this saving benefit provision. *Id.* ¶ 548.07, at 548–61. Although the good faith requirement here is not susceptible of precise definition, *id.,* surely a finding of actual fraud under section 548(a)(1) precludes any opportunity for a lien under section 548(c) to the extent of any value given.

### III. *Preferences*

■ As noted earlier, between the time he regained control of Roco and the date the bankruptcy petition was filed, Consove had the corporation issue him checks totalling $36,886.69. The bankruptcy court held that the $26,158.55 of this amount that was

---

11. 11 U.S.C. § 548(c) (Supp.V 1981) provides:
 (c) Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good

faith has a lien on any interest transferred, may retain any lien transferred, or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

applied to the balance due Consove for officer loans was a preference under section 547(b).[12] It follows from our finding that the bankruptcy court did not err on the fraudulent transfer and section 548(c) issues that it also did not err in its conclusion that the payments here constituted a preference; these payments clearly fall within section 547(b) because they enabled Consove to receive more than he would have otherwise received under chapter 7.

## IV. Conclusion

We affirm the bankruptcy court's finding, as affirmed by the appellate panel, that the redemption of Consove's shares of Roco resulted in a fraudulent transfer under both the constructive and actual fraud provisions of the Bankruptcy Code and that subsequent payments of $26,158.95 constituted an avoidable preference. Accordingly, the court properly ordered Consove to turn over to the Trustee $21,600 he received as interest and $10,727.74 he received as principal on the $300,000 note as well as the $26,158.95 preference item. In trying to establish the existence of goodwill in the company, Consove at one point testified that he thought he was entitled to $100,000 as the price for his thirty-four years devoted to the business. This overlooks the fact that he could have provided for his retirement throughout his working years either through personal savings and investment or some type of corporate retirement package fully disclosed on the company's financial records. Having failed to do this, he cannot suddenly create for himself a stream of retirement income at the expense of the company's creditors.

*Affirmed.*

---

12. 11 U.S.C. § 547(b) (Supp.V 1981) provides:
    (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—
    (1) to or for the benefit of a creditor;
    (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
    (3) made while the debtor was insolvent;
    (4) made—
    (A) on or within 90 days before the date of the filing of the petition; or
    (B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—
    (i) was an insider; and
    (ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and
    (5) that enables such creditor to receive more than such creditor would receive if—
    (A) the case were a case under chapter 7 of this title;
    (B) the transfer had not been made; and
    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.