

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-2-2000

# Buncher Co. v. Official Com. of Unsec. Creditors

Precedential or Non-Precedential:

Docket 99-3925 & 99-3950

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Buncher Co. v. Official Com. of Unsec. Creditors" (2000). *2000 Decisions.* Paper 210.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/210

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 2, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 99-3925 & 99-3950

BUNCHER COMPANY;
FINANCIAL INSTITUTIONAL FUNDING, INC.;
RICHARD SANTUCCI; JOHN T. STABILE

v.

OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF
GENFARM LIMITED PARTNERSHIP IV,
        Cross-Appellants in 99-3950

BUNCHER COMPANY; JOHN T. STABILE,
        Appellants in 99-3925

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(D.C. No. 98-cv-00792)
District Judge: Honorable Donetta W. Ambrose

Argued August 8, 2000

Before: BARRY, WEIS and GREENBERG, Circuit Jud ges

Filed: October 2, 2000

        Robert J. Ridge, Esquire (ARGUED)
        Katarincic & Salmon
        2600 CNG Tower
        Pittsburgh, PA 15222

        Attorney for Appellants
        The Buncher Company, D.C. and
        John T. Stabile

        David B. Salzman, Esquire
          (ARGUED)
        Philip E. Milch, Esquire
        Campbell & Levine, LLC
        1700 Grant Building
        Pittsburgh, PA 15219

        Counsel for Appellees/
        Cross-Appellants Official Committee
        of Unsecured Creditors of GenFarm
        Limited Partnership IV

OPINION OF THE COURT

WEIS, Circuit Judge.

In this appeal we conclude that when limited partners sold their interests to their financially strapped partnership, the transaction was a constructive fraudulent conveyance, and as such it was properly declared void by the bankruptcy judge. Because the ruling by the bankruptcy judge restored the former partners to their previous status of equity investors, it was unnecessary for the bankruptcy judge to rule on the matter of subordination, advanced as an alternative theory of recovery. We will affirm the judgment as to the fraudulent conveyance and vacate the ruling on subordination raised in the cross-appeal.

This is an adversary proceeding brought by the Official Committee of Unsecured Creditors of GenFarm Limited Partnership IV against D. C. Guelich Explosive Co., Inc. and other former limited partners referred to collectively here as the Buncher Group.[1] In 1988, Rodney Bohn organized GenFarm IV as a limited partnership with himself as sole general partner for the purpose of establishing and operating an experimental dairy farm in Florida. The

---

1. In the Bankruptcy Court the Buncher Group included the Buncher Company, Financial Institutional Funding, Inc., John T. Stabile, and Richard J. Santucci. Financial Institutional, Santucci and Guelich have since settled their disputes with the Committee and are no longer parties in this dispute.

partnership filed a petition under Chapter 11 in June of 1995; and all of the assets were scheduled to be sold to Ebony Bull Capital Co., an entity controlled by Bohn. The Buncher Group objected to the sale price as inadequate, but withdrew its opposition upon payment of $300,000, now held in escrow, and a promissory note in the amount of $700,000 from Ebony Bull.

In August 1992, Guelich, the Buncher Group, and GenFarm IV filed several law suits in state courts against Ebony Bull and Bohn to remove him as general partner and recover damages. The allegations against Bohn are described in detail in the following excerpt from the state trial judge's opinion overruling preliminary objections:

> "Plaintiffs [GenFarm IV, Guelich, and the Buncher Group] claim that Mr. Bohn and Ebony Bull have engaged in various acts of fraud and misrepresentation to the detriment of the limited partners. They allege that prior to the formation of the partnership, Mr. Bohn represented that the genetics program was in place on other farms even though he knew that it was not yet viable; that he failed to describe unfavorable information that he had received concerning the operations of other dairy farms which he was operating through Ebony Bull; that he purchased cows for GenFarm IV from his other farms for substantial sums of money even though they had no value; that he purchased semen from his other farms that was never used; that he chose a site for GenFarm IV which he knew to have environmental problems without furnishing this information to the limited partners; that he obtained the limited partners' approval for additional borrowing by misrepresenting the condition of the business and overstating its value; that he made unauthorized payments to Ebony Bull and other entities which he operated; and that he engaged in fraudulent activities in connection with March 1990 and November 1991 transactions with banks that resulted in a refinancing of the partnership's indebtedness and increased indebtedness. Mr. Bohn denies these allegations -- he contends that plaintiffs cannot produce evidence showing that he breached any fiduciary duties."

GenFarm Limited Partnership IV v. Ebony Bull Capital Corp., 141 P.L.J. 190, 191 (Pa. Ct. of Common Pleas 1993).

The parties settled the state court suits in June 1993 with each party agreeing to release all claims against the others. The settlement called for a closing transaction on October 4, 1993. Bohn had the option to step down and turn over his interests in the partnership, or remain as general partner and purchase the interests of Guelich and the Buncher Group. He chose the latter, but assigned to GenFarm IV his right to purchase. At the closing, GenFarm IV bought the limited partnership interests for $3.5 million in cash and a note secured by a second-priority mortgage on substantially all the partnership assets. On that same day, GenFarm IV sold the interests it had purchased from the Buncher Group and Guelich, together with minor limited partnership interests that it had previously acquired, to Bohn and Ebony Bull for $1.705 million.

Simultaneously, GenFarm IV refinanced its obligations to its bank. Following the closing, GenFarm IV increased the herd size, but the following summer it began selling cows in order to pay expenses. The partnership continued its downward financial spiral, culminating in the Chapter 11 petition.[2]

In January 1996, the Committee filed this adversary action against Guelich and the Buncher Group to recover all payments made pursuant to the 1993 settlement, the $300,000 escrow fund, and the $700,000 Ebony Bull note. The complaint alleges claims under theories of fraudulent conveyance, preferences and subordination.

After a bench trial, the bankruptcy judge found that the October 4, 1993 transactions rendered the partnership insolvent and that GenFarm IV did not receive fair compensation for the Buncher Group limited partnership interests. He also determined that between October 1993 and the petition date, the Buncher Group received

_____

2. Other limited partnerships established by Bohn for similar ventures also went into bankruptcy. Although some relationships between these entities and GenFarm IV existed, they are not material to the issues raised on this appeal.

4

$822,851.77 in the initial transfer and in payments on the $2.75 million note of GenFarm IV.

The Bankruptcy Court rejected the contention that the release of GenFarm IV in the 1993 settlement benefitted the partnership, pointing out that the Buncher Group had not asserted any claims against GenFarm IV in the state litigation. In addition, the Court noted that the retention of Bohn as general partner was, if anything, a detriment to GenFarm IV, and that the refinancing with the bank that was part of the settlement was so restrictive that it did not provide a benefit to the partnership.

After analyzing the various elements of the 1993 settlement agreement, the Bankruptcy Court decided that the transaction was voidable under Pennsylvania's Uniform Fraudulent Conveyance Act. Pa. Stat. Ann. tit. 39,SS 351–63 (repealed Dec. 3, 1993 and replaced by the Uniform Fraudulent Transfer Act, 12 Pa. Cons. Stat. Ann.SS 5101–10 (effective February 1, 1994)). The Court then considered the question of subordination and determined that in the circumstances, section 510(b) of the Bankruptcy Code required that the Buncher Group's claims be subordinated to the claims of unsecured creditors.

Having determined that the 1993 settlement was a fraudulent conveyance, the Court declared that the note and mortgage of that date in the amount of $2.75 million were void. The Court directed the Buncher Group to turn over to the debtor's estate the $822,851.77 received from GenFarm IV pursuant to that note and mortgage, as well as the $300,000 in the escrow account and the $700,000 note from Ebony Bull.

On appeal, the District Court held that the bankruptcy judge did not err in finding that GenFarm IV received no benefit from the release of claims by the Buncher Group. Further, the Group's limited partnership interest did not constitute fair consideration for the cash and note received from the 1993 settlement.

The District Court, however, concluded that as a result of the settlement, the Buncher Group did not have an equity interest in GenFarm IV at the time the Chapter 11 petition was filed, and therefore the mandatory subordination

provisions of section 510(b) of the Bankruptcy Code did not apply. Consequently, the Court reasoned it was necessary to consider equitable subordination under section 510(c).

The District Court also rejected an additional claim presented for the first time on appeal by the Buncher Group. It had argued it was entitled to a lien for the amount transferred to GenFarm IV in the voided fraudulent conveyance. Because the Buncher Group had failed to raise the issue in the Bankruptcy Court, the District Court held that the claim for a lien had been waived. The Court, therefore, affirmed the judgment in favor of the Committee on the fraudulent conversion claim, but reversed and remanded on the subordination issue.

On appeal to this Court, the Buncher Group argues that the release of claims against GenFarm IV constituted fair consideration for the 1993 settlement. In addition, the Group contends that the bankruptcy judge erred in not considering the value of the partnership interests transferred to GenFarm IV and in failing to grant a lien for that amount. The Committee filed a cross-appeal from the District Court's reversal of the mandatory subordination order of the Bankruptcy Court.

I.

The District Court's remand of the subordination issue raises an issue of finality that must be considered in connection with our appellate authority. We have jurisdiction under 28 U.S.C. S 158(d) to review "final decisions, judgments, orders and decrees entered under subsections (a) and (b) of this section." Section 158(a) in turn authorizes district court review of final and interlocutory orders of bankruptcy judges. The Bankruptcy Court's disposition of the adversary proceeding here was unquestionably final, but the District Court's order is not so readily categorized.

Based on pragmatic considerations unique to this area of the law, we have traditionally applied a relaxed standard of finality in bankruptcy cases. United States Trustee v. Gryphon at the Stone Mansion, Inc., 166 F.3d 552, 556 (3d Cir. 1999). Under this standard, a partial remand by the

6

District Court does not automatically bar us from considering an appeal. Id.

In deciding whether this Court has jurisdiction, four factors are pertinent:

> (1) The impact on the assets of the bankrupt estate;
>
> (2) Necessity for further fact-finding on remand;
>
> (3) The preclusive effect of our decision on the merits of further litigation; and
>
> (4) The interest of judicial economy.

Official Committee v. Westmoreland County MH/MR., 183 F.3d 273, 277 (3d Cir. 1999). The most important of these factors is the impact on the bankruptcy estate. In re Blatstein, 192 F.3d 88, 94 (3d Cir. 1999); In re Meyertech Corp., 831 F.2d 410, 414 (3d Cir. 1987). See also Commerce Bank v. Mountain View Village, Inc., 5 F.3d 34, 37 (3d Cir. 1993) (discussing finality); In re Porter, 961 F.2d 1066, 1072 (3d Cir. 1992) (same).

A passing glance at the parties' contentions in this appeal reveals that a major effect on the estate's assets is at stake. As a result of the Bankruptcy Court's determination, any substantial recovery by the unsecured creditors will be affected by the outcome of this appeal. Furthermore, because the record from the trial has been fully developed, it appears unlikely that additional fact-finding would be required in the Bankruptcy Court. From a pragmatic standpoint, resolution of this matter must be made at some point, and expeditious disposition would best serve the interests of all concerned. We therefore conclude that we should review the appeal at this juncture.

II.

Our standard of review is set out in Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 102 (3d Cir. 1981). In assessing the trial court's ruling, we apply the clearly erroneous test to narrative facts and plenary review to questions of law. Id. Ultimate facts are examined by applying the appropriate standards to the factual and legal components. Id.

7

The Bankruptcy Code provides that a trustee in a bankruptcy proceeding "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim . . . ." 11 U.S.C. S 544(b) (1979). In this case, the applicable law is that of Pennsylvania as set out in the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and the Statute of 13 Elizabeth.3See Pa. Stat. Ann. tit. 39, S 361; 12 Pa. Cons. Stat. Ann. S 5110; Golder v. Bogash, 188 A. 837, 838 (Pa. 1937).

The purpose of fraudulent conveyance law is to make available to creditors those assets of the debtor that are rightfully a part of the bankruptcy estate, even if they have been transferred away. See In re Cybergenics Corp., No. 99-5592, 2000 WL 1257270, at *3-4 (3d Cir. 2000). When recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors, including those who individually had no right to avoid the transfer. 2 Collier Bankruptcy Manual  P 544.09[5] (Lawrence P. King ed., 3d ed. rev. 1999). The remedy in this section adopts the longer "reach-back" provisions of state law. Id. P 544.09[2].

Under section 4 of Pennsylvania's Uniform Fraudulent Conveyance Act, a conveyance made or obligation incurred by a person who thereby becomes insolvent is fraudulent as to creditors, regardless of intent, if the transaction is without fair consideration. Pa. Stat. Ann. tit. 39,S 354. Section 5 provides that when a person in business conveys assets without fair consideration and receives so little in return that the remaining capital is unreasonably small, the transaction is fraudulent as to creditors. Pa. Stat. Ann. tit. 39, S 355. Like section 4, section 5 does not consider intent. Id.

Fair consideration is given when property of a fair equivalent is transferred in good faith. Pa. Stat. Ann. tit. 39, S 353(a). A party lacks good faith if it knows that the

_____

3. The parties do not contend that the differences between the Fraudulent Conveyance Act and the Fraudulent Transfer Act affect the outcome in the present case.

transaction would render the other party insolvent. Id.; United States v. Tabor Court Realty Corp., 803 F.2d 1288, 1296 (3d Cir. 1986).

Section 4 refers to insolvency immediately before the conveyance or it can mean "present insolvency after the conveyance as affected by it." Angier v. Worrell, 31 A.2d 87, 89 (Pa. 1943). In Larrimer v. Feeney, 192 A.2d 351, 353 (Pa. 1963), the Pennsylvania Supreme Court held that the Uniform Fraudulent Conveyance Act encompassed insolvency in the bankruptcy sense, i.e., a negative net worth; and also in the equity sense, i.e., the debtor has insufficient presently salable assets to pay existing debts as they come due.

The primary inquiry under a constructive fraud provision is limited to whether there is a link between the challenged conveyance and the debtor's insolvency. If insolvency is established, the burden shifts to the transferee to show that the assets were transferred for fair consideration. Elliott v. Kiesewetter, 98 F.3d 47, 56–57 (3d Cir. 1996).

The bankruptcy judge in this case heard conflicting expert testimony on whether GenFarm IV was rendered insolvent by the October 1993 transaction. He analyzed the evidence at some length in his opinion and concluded that GenFarm IV "was insolvent on October 4, 1993, or became insolvent as a result of the closing on the Settlement Agreement."

The Buncher Group does not frontally assault the insolvency findings. Instead, it argues that the bankruptcy judge erred in failing to properly evaluate the consideration the Buncher Group furnished to GenFarm IV in the settlement. In that connection, the Group says that it released the partnership from viable claims worth in excess of $9 million.

In its brief, the Buncher Group states that "the Committee stipulated that a fraud was being perpetrated on the [Buncher Group]. Thus, it is entirely uncontradicted that the [Buncher Group] had valid, viable claims against GenFarm IV, which they released." The record, however, does not bear out this statement. During the trial, some discussion took place about the fraud issues asserted in

9

the state litigation by the Buncher Group. The bankruptcy judge stated, "I think you will all agree that the [Buncher Group] defendants here believe that Rodney Bohn was guilty of fraud in formulating and operating this limited partnership." Committee counsel replied, "And, as I said, Your Honor, we will stipulate that they believe that." This exchange is far from a concession that the Buncher Group had viable claims against GenFarm IV, whatever might have been the circumstances with respect to claims against Bohn.

The Buncher Group also argued in the Bankruptcy Court that part of the $3.5 million it received was in return for releasing claims against the partnership not asserted in the state suit. The Buncher Group suggested that the subsequent sale of the limited partnership interest by GenFarm IV to Ebony Bull for $1.705 million on the closing date established the value of those interests. The Buncher Group pointed out that it received $3.5 million when it conveyed those same interests to the partnership. Accordingly, it argued the difference between the two figures was some measure of the value of the Buncher Group's release of claims against GenFarm IV.

Although somewhat persuasive on its face, this argument fails when the terms of the settlement agreement are examined closely. The settlement was based on the premise that the Buncher Group and Bohn would go their separate ways. Between the June agreement date and the October closing day, Bohn was forced to choose between buying out the Buncher Group, or turning over his interests in the partnership. As counsel for the Buncher Group stated at oral argument before this Court, "the way we[settled the case] we did not know who [was] going to wind up with control of this partnership, but whoever does, that's it. . . . Everyone has to go their separate ways."

Significantly, the $3.5 million obligation agreed to by Bohn under the buyout option was his alone, although he was free to assign it to anyone, including GenFarm IV. Sometime later, but before the October closing date, Bohn opted to assign to GenFarm IV the right to buy the Buncher Group shares.

10

Thus, the $3.5 million clearly was not based in part on any previously unasserted claims against the partnership. The $3.5 million figure was agreed upon in negotiations between the Buncher Group and Bohn on his own behalf. If the $3.5 million figure represented any claims other than the value of the Buncher Group's partnership interest, these would have been claims against Bohn, not against GenFarm IV.

If Bohn had not assigned his obligation to GenFarm IV, the Buncher Group would still have received the $3.5 million and the partnership would have owed nothing to the Buncher Group. Whatever Bohn's motives for transferring his obligation to GenFarm IV, the assignment does not establish the Buncher Group's contention that a portion of the $3.5 million represents payment for claims against GenFarm IV.

The Buncher Group failed to persuade the bankruptcy judge that it had viable claims at the time of the settlement in any amount, let alone $9 million, a figure which included treble damages under a theoretical RICO claim. In dismissing the Buncher Group's arguments, the bankruptcy judge observed that it had not presented any claim against GenFarm IV in the state litigation, but that its fire had been directed solely at Bohn, not the partnership.

Neither the Bankruptcy Court nor this Court disputes the Buncher Group's contention that a release of a claim not in suit may serve as consideration for a settlement, but the Group failed to establish the reality of such claims. On this record, the unasserted claims may fairly be considered non-existent. Consequently, the bankruptcy judge properly found that no part of the consideration received by the Buncher Group represented compensation for release of claims against the partnership.

In scrutinizing the transfer of the Buncher Group's partnership interest, the Bankruptcy Court correctly treated the interest of a limited partnership as an equity security. Under the Bankruptcy Code, the term "equity security" includes the "interest of a limited partner in a limited partnership." 11 U.S.C. S 101(16)(B). Citing In re

11

Roco Corp., 701 F.2d 978, 982 (1st Cir. 1983), the judge concluded that a partnership receives less than reasonably equivalent value when it redeems the equity interest of its principals. Roco held that in determining whether a stock redemption is a fraudulent transfer, a transaction in which the corporation receives nothing but outstanding stock amounts simply to a reduction in capitalization. Id. From the perspective of the creditors, there is ordinarily no value to the corporation in such an exchange.

The Buncher Group argues that "[u]nder [this] rationale, a valid and legitimate settlement between a debtor and an equity interest holder, even if it is reached years prior to bankruptcy, is subject to being set aside." This objection ignores the fact that it is insolvency which cabins the reach of fraudulent conveyance law. Therefore, where equity shareholders inform themselves of the entity's solvency, this concern is allayed.

In effect, what the Buncher Group sought as a result of the October 1993 transaction was to transform its failing investment into a secured creditor relationship, to the detriment of the partnership's unsecured creditors. We conclude that the Bankruptcy Court was correct in its determination that from the creditors' perspective, the partnership did not receive fair consideration.

The Buncher Group also protests the fact that the Bankruptcy Court did not award a lien for the value it transferred to GenFarm IV. In United States v. Tabor Court Realty, 803 F.2d at 1298-99, we cited section 548(c) of the Bankruptcy Code providing that a transferee or obligee of a fraudulent transfer or obligation who takes for value and in good faith may retain the interest transferred or the obligation incurred. That provision permits a good faith transferee or obligee to retain his lien.

We agree with the District Court that the Buncher Group waived the lien issue by failing to raise it in the Bankruptcy Court. Not only did the Buncher Group neglect to raise the issue at trial, but the evidence in the record is insufficient to permit a court to realistically value the lien.

III.

We come now to the Committee's cross-appeal challenging the District Court's remand of the

12

subordination issue to the Bankruptcy Court. It is helpful to put the cross-appeal in context. In the adversary proceeding, the Committee sought relief under several alternative theories. In its brief at the conclusion of the trial, the Committee said, "to the extent that the Committee could establish, either through successful prosecution of the fraudulent conveyance claim or the equitable subordination claim, that such claim was not allowable or alternatively, subject to subordination, the escrow fund would belong to the estate." In this connection, it is worth noting again that the Committee had also sought recovery under a preference theory.

The contingent nature of the subordination claim is demonstrated in the Committee's response to this Court's pre-argument inquiry about appellate jurisdiction. The Committee explained that it had pleaded four alternative causes of action, three of which were based on theories that might have been applied had the fraudulent conveyance count failed. "Once the transfer is avoided," the Committee wrote, "applicable law mandates Buncher be returned to its original status as an equity holder. Such a result affords the Committee complete relief in this matter, inasmuch as everything received by Buncher in respect of the Transfer would be avoided and returned to the Debtor's bankruptcy estate." In short, the cross-appeal was a precautionary move by the Committee to be considered by this Court only if the fraudulent conveyance judgment were reversed; if the fraudulent conveyance claim is affirmed, the Committee disclaims its cross-appeal.

Once they had upheld the fraudulent conveyance claim, the Bankruptcy Court and the District Court need not have addressed the subordination count because it was academic at that point. In the interest of prudence and judicial economy, both courts chose to discuss the issue for the benefit of appellate review. This practice is frequently followed and is an aid to judicial efficiency. We conclude, however, at this juncture that the subordination claim is no longer germane and we need not discuss it.

Accordingly, we will affirm the judgment of the District Court insofar as it affirms the Bankruptcy Court's ruling on the fraudulent conveyance action. We will modify the

District Court's remand to the Bankruptcy Court by directing that the District Court direct the Bankruptcy Court to vacate its order on the subordination claim.

A True Copy:
Teste:

    Clerk of the United States Court of Appeals
    for the Third Circuit

14